BENJAMIN KASSIS (SBN 298844)
ben@frostllp.com
BENJAMIN GRUSH (SBN 335550)
bgrush@frostllp.com
DAVID TIRATURYAN (SBN 350995)
david1@frostllp.com
FROST LLP
10960 Wilshire Boulevard, Suite 2100
Los Angeles, California 90024
Telephone: (424) 254-0441
Facsimile: (424) 600-8504

Attorneys for Defendant
ALEXANDRA MARWA SABER p/k/a DENIMS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TED ENTERTAINMENT, INC., a California Corporation,<br><br>              Plaintiff,<br><br>      vs.<br><br>ALEXANDRA MARWA SABER f/k/a MARWA TALATT ABDELMONEM p/k/a DENIMS, an individual, and DOES 1-10,<br><br>              Defendants. | Case No. 2:25-cv-05564-WLH-PD<br><br>*Hon. Wesley L. Hsu*<br><br>**ALEXANDRA MARWA SABER'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**[Fed. R. Civ. P. 12(c)]**<br><br>*Filed concurrently with Declaration of Benjamin Kassis; [Proposed] Order*<br><br>Hearing Information:<br>Date:    June 5, 2026<br>Time:    1:30 p.m.<br>Crtrm.: 9B (9th Floor)<br><br>Action filed:    June 19, 2025 |

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

**TO ALL PARTIES AND TO THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on June 5, 2026, at 1:30 p.m., or as soon thereafter as counsel may be heard, in the courtroom of the Honorable Wesley L. Hsu, located in the First Street U.S. Courthouse, 350 West 1st Street, Courtroom 9B, 9th Floor, Los Angeles, California 90012, Defendant Alexandra Marwa Saber p/k/a Denims ("Defendant" or "Denims") will and hereby does move this Court, pursuant to FRCP 12(c), for an order granting her Motion for Judgment on the Pleadings and entering judgment in her favor and against Plaintiff Ted Entertainment, Inc. ("Plaintiff" or "TEI") on Plaintiff's first claim for relief for direct copyright infringement as to "The Nuke"[1] based on the Second Affirmative Defense of fair use, as pled in Defendant's Answer. (ECF No. 19 at 10:1–5.)

This Motion is made on the grounds that Defendant's livestream reaction to The Nuke constitutes fair use as a matter of law under 17 U.S.C. § 107. As Plaintiff itself concedes, Defendant's use of The Nuke was "highly transformative" (Compl. ¶ 70.o, ECF No. 1), and all four statutory fair use factors weigh in Defendant's favor.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Declaration of Benjamin Kassis, all pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

Pursuant to Local Rule 7-3 and Section G of this Court's Standing Order, counsel for the parties thoroughly discussed the substance and potential resolution of this Motion by telephone on February 23, 2026 and March 17, 2026. (Declaration of Benjamin Kassis ("Kassis Decl.") ¶¶ 2-4.) Despite the meaningful exchange between

---

[1] As defined in the Complaint, The Nuke refers to *Content Nuke: Hasan Piker* (Compl. ¶ 2, ECF No. 1.) TEI lodged the deposit copy of The Nuke as Exhibit D to the Complaint and the broadcast version as Exhibit E. (*Id.* ¶ 38 n.34.)

counsel, the parties were ultimately unable to reach a resolution that would obviate the need for this Motion. (*Id.*)

DATED: April 17, 2026                    FROST LLP


By: _____
BENJAMIN KASSIS
BENJAMIN GRUSH
DAVID TIRATURYAN
Attorneys for Defendant
ALEXANDRA MARWA SABER p/k/a
DENIMS

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION .......................................................................................1

II.   FACTUAL BACKGROUND.....................................................................3

    A.   The Parties. ......................................................................................3

    B.   The Nuke. .........................................................................................3

    C.   Denims' Livestream Reaction to The Nuke. ...................................4

III.  LEGAL STANDARD................................................................................5

IV.   THE COURT SHOULD GRANT DENIMS' MOTION FOR JUDGMENT ON THE PLEADINGS.............................................................6

    A.   Applicable Law on Fair Use..............................................................6

    B.   Denims' Use of The Nuke Constitutes Fair Use. .............................7

        1.   The Purpose and Character of The Use Is Highly Transformative, Outweighing Any Incidental Commerciality. ..........................................7

            (a)  Denims' Use of The Nuke Was Highly Transformative. ...............9

            (b)  The *De Minimis* Commercial Nature of Denims' Use Is Incidental and Does Not Outweigh Its Transformative Character................12

        2.   The Documentary and Informational Nature of The Nuke Favors Fair Use. .............................................................14

        3.   The Amount Used Was Reasonable and Necessary for Denims' Commentary................................................15

        4.   Denims' Livestream Does Not Serve as a Market Substitute for The Nuke. ........................................................18

V.    CONCLUSION.........................................................................................22

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Title Ins. Co. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988) ................................................................................... 9

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
598 U.S. 508 (2023) ............................................................................... 7, 10, 11

*Balistreri v. Pacifica Police Dep't*,
901 F.2d 696 (9th Cir. 1988) ................................................................................. 6

*Campbell v. Acuff-Rose Music, Inc.*,
510 U.S. 569 (1994) ..................................................................................... *passim*

*City of Inglewood v. Teixeira*,
2015 WL 5025839 (C.D. Cal. Aug. 20, 2015) ............................................... 13, 21

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ............................................................................. 7, 8

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
109 F.3d 1394 (9th Cir. 1997) ............................................................................. 14

*DraftExpress, Inc. v. Whistle Sports, Inc.*,
2022 WL 16962285 (C.D. Cal. Aug. 2, 2022) ................................................. 8, 13

*Dworkin v. Hustler Mag. Inc.*,
867 F.2d 1188 (9th Cir. 1989) ............................................................................... 5

*Equals Three, LLC v. Jukin Media, Inc.*,
139 F. Supp. 3d 1094 (C.D. Cal. 2015) ..................................................... 9, 13, 16

*FEC v. Adams*,
558 F. Supp. 2d 982 (C.D. Cal. 2008) (Fischer, J.) .............................................. 6

*Fleming v. Pickard*,
581 F.3d 922 (9th Cir. 2009) ................................................................................. 5

*Google LLC v. Oracle Am., Inc.*,
593 U.S. 1 (2021) ............................................................................................... 6, 7

iv

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

*Haas v. Travelex Ins. Servs. Inc.*,
   555 F. Supp. 3d 970 (C.D. Cal. 2021)...............................................................22

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
   896 F.2d 1542 (9th Cir. 1989).............................................................................5

*Hannley v. Mann*,
   2023 WL 3407183 (C.D. Cal. Mar. 8, 2023) .....................................................10

*Harper & Row Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985) ...........................................................................................18

*Hosseinzadeh v. Klein*,
   276 F. Supp. 3d 34 (S.D.N.Y. 2017)...............................................10, 15, 16, 19

*Hughes v. Benjamin*,
   437 F. Supp. 3d 382 (S.D.N.Y. 2020)....................................................19, 20, 21

*Hustler Mag., Inc. v. Moral Majority, Inc.*,
   606 F. Supp. 1526 (C.D. Cal. 1985), aff'd, 796 F.2d 1148 (9th Cir.
   1986) ...................................................................................................................14

*Hustler Mag. Inc. v. Moral Majority Inc.*,
   796 F.2d 1148 (9th Cir. 1986)............................................................................13

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003)........................................................................14, 18

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018)................................................................................6

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005)..............................................................................7

*Marcus v. ABC Signature Studios, Inc.*,
   279 F. Supp. 3d 1056 (C.D. Cal. 2017)...............................................................7

*Mattel, Inc. v. Walking Mountain Prods.*,
   353 F.3d 792 (9th Cir. 2003)........................................................................13, 15

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988)................................................................................6

*Monge v. Maya Mags., Inc.*,
   688 F.3d 1164 (9th Cir. 2012)............................................................................14

v

*Peterman v. Republican Nat'l Comm.*,
    369 F. Supp. 3d 1053 (D. Mont. 2019) ...............................................................11

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
    907 F. Supp. 1361 (N.D. Cal. 1995)...................................................................11

*Righthaven LLC v. Klerks*,
    2010 WL 3724897 (D. Nev. Sept. 17, 2010) ......................................................14

*Romanova v. Amilus Inc.*,
    138 F.4th 104 (2d Cir. 2025)................................................................................7

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013).............................................................................15

*SOFA Ent., Inc. v. Dodger Prods., Inc.*,
    709 F.3d 1273 (9th Cir. 2013)......................................................................*passim*

*Solis v. Am. Airlines, Inc.*,
    2021 WL 4893247 (C.D. Cal. July 27, 2021) (Gutierrez, J.)...............................6

*Stebbins v. Alphabet Inc.*,
    2025 WL 2233208, at *5 (N.D. Cal. July 2, 2025) ......................................*passim*

*Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
    953 F.3d 638 (9th Cir. 2020)...............................................................................19

*Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*,
    447 F.3d 769 (9th Cir. 2006)...............................................................................13

*Weinberg v. Dirty World, LLC*,
    2017 WL 5665023 (C.D. Cal. July 27, 2017) .....................................................10

**Federal Statutes**

17 U.S.C.
    § 107 .............................................................................................................3, 6, 8, 14

Copyright Act .......................................................................................................18

**Other Authorities**

Fed. Rules of Civ. Proc.
    Rule 12(b) ..............................................................................................................5
    Rule 12(c) ..............................................................................................................5

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This case is about a livestreamer on the interactive social media platform "Twitch" who is defending herself against a copyright infringement lawsuit for doing what livestreamers online do: watch material posted online and react critically and mockingly to a live audience, who – in this case – followed along and participated in a contemporaneous live chat.

As alleged in plaintiff Ted Entertainment Inc.'s ("TEI") perplexingly long 79-page copyright infringement Complaint, defendant Alexandra Marwa Saber p/k/a "Denims" is one of a large community of online actors who, through host platforms like Twitch, engage with their online audience through livestreams to discuss trending issues of public interest, public controversy, and global affairs. TEI, through its owner the widely known YouTuber Ethan Klein, filed this action seeking statutory damages against Denims alleging her livestreamed "reaction" to TEI's "tragi-comic documentary" entitled *Content Nuke: Hasan Piker* ("The Nuke") posted on TEI's YouTube channel on January 31, 2025, is copyright infringement.

It is undisputed that Denims livestreamed The Nuke on her Twitch page shortly after it was posted and critically appraised the documentary before her audience, who followed the discussion and made their own comments in a live chat – both on The Nuke itself and on Denims' own commentary. Denims did not otherwise repost or republish The Nuke according to the pleadings. This case concerns Denims' one-time livestream reaction to The Nuke documentary.

The focus of TEI's 102-minute long documentary is the controversial political ideologies of, the Complaint alleges, the "alt-left" Twitch megastar Hasan Piker ("Piker") regarding the Israel-Palestine conflict. The film aims to "expose how Hasan radicalizes people online to be antisemitic and anti-Israeli" and criticizes Twitch as a platform that, according to TEI, should be ashamed for platforming "radical left" points of view such as Piker's. The Nuke, other than openly being a hit piece on Piker,

1

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

consists essentially of Klein's positions and musings on certain geo-political issues, political ideology, and current events relating to the conflict in the Middle East.

As alleged in the Complaint, the day The Nuke was posted to TEI's YouTube channel "h3h3Productions," Denims put out a livestream on her Twitch page where she watched (herself for the first time) and "reacted to" The Nuke. During her livestream reaction, Denims paused the Nuke 211 times to interject with real-time commentary and criticism. She also engaged directly with her live audience via a real-time chat contemporaneous with her live reaction. Denims' critique of The Nuke ran 235 minutes, ~2.5x times longer than the original. Some of Denims' "commentary pauses" ran as long as 8 minutes; many of them ranged between 1 and 5 minutes. On four occasions, Denims pulled The Nuke off the screen, pulled up other video content related to the subject matter at hand, and (at one point for up to 6 minutes) watched and discussed that other content with her audience.

The content of Denims' commentary ranged (indeed, this was a live event), but the quintessence of her comments were critical and derisive—of Klein himself, of the production of The Nuke, and of the substantive messaging presented by the film, which Denims opposed and rebutted during her livestream. While the Complaint—applying a super-hyper-technical analysis of Denims' reaction livestream, contends Denims' commentaries do not do "enough" to constitute fair use, in the other breath TEI in the Complaint concedes that "Denims … makes a ***highly transformative use of The Nuke***," using it for the "exact opposite purpose" of TEI's purpose in making The Nuke—i.e., to allegedly "radicalize her audience to be … anti-Israeli, along with defending [Piker]."

Denims' use of The Nuke as the object of contemporaneous criticism and debate, regardless of the substance of the views expressed, is paradigmatically transformative; the portions of The Nuke used by Denims were tied to that critical purpose; and the Complaint does not plausibly articulate how Denims' livestream constitutes a market substitute, nor can it, given the intrinsic differences in the

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

consumer profile for Klein – producer of The Nuke and outspoken supporter of Israel in the Israel-Palestine conflict – on the one hand, and the allegedly "alt-left" Denims, who, according to the Complaint, and like Piker, has openly expressed pro-Palestine ideologies and whose evident mission in reacting to The Nuke was to rebut the views of Klein and advance her own and Piker's.

Denims' livestream is classic "fair use" under 17 U.S.C. § 107. On these facts, Denims did not commit copyright infringement as to The Nuke as a matter of law. Judgment on the pleadings is warranted.

## II.    FACTUAL BACKGROUND

### A.    The Parties.

Plaintiff TEI is a California corporation founded in 2016 by Ethan and Hila Klein that produces content for social media, principally YouTube. (Compl. ¶¶ 9, 12.) The Kleins rose to prominence creating reaction videos on YouTube in which they interspersed segments of other creators' works with their own commentary. (*Id.* ¶ 12.)

Defendant Alexandra Marwa Saber, known online as "Denims," is a left-leaning livestreamer who broadcasts content on the widely used streaming platform Twitch. (*Id.* ¶ 10.) TEI describes Denims as "the alt-left's answer to Kellyanne Conway," a "revolutionary from the comfort of her bedroom in California." (*Id.* ¶ 16.) According to TEI, she is also "one of the most loyal and ardent defenders of Hasan Piker – the most prominent alt-left streamer on Twitch" (*id.* ¶ 17) and the primary subject of The Nuke.

### B.    The Nuke.

The Nuke is a "tragi-comic documentary" running 1 hour and 42 minutes in length that TEI publicly released on YouTube on January 31, 2025. (Compl. ¶¶ 38, 40, 41 & Exs. D, E.) The Nuke centers on Klein's "thesis … that [online public figure] Hasan [Piker] radicalizes his audience with genocidal and antisemitic terrorist propaganda." (*Id.* ¶ 40.a.) TEI registered The Nuke with the United States Copyright Office prior to its release, receiving registration number PAu 4-256-429. (*Id.* ¶ 38.)

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

The Nuke is organized into seven sections, six of which are primarily informational and devoted to political discourse. (*Id.* ¶ 40.) "The Prologue" presents the thesis that Piker radicalizes his audience, and includes publicly available archival footage and Klein's own assertions about the Israel-Palestine conflict. (*Id.* ¶ 40.a.) Three substantive sections on the Houthis, Hezbollah, and Hamas each catalogue the groups' conduct and critique Piker's coverage concerning the Middle East conflict through clips from Piker's broadcasts, news reports, United Nations findings, and other archival materials. (*Id.* ¶¶ 40.c–e.) "The Twitch Section" documents Twitch's content moderation practices through screenshots, employee social media posts, policy documents, and clips from Twitch's CEO. (*Id.* ¶ 40.f.) The sole arguably "creative" section is a five-minute parodic sketch of a Twitch advertising executive, running from approximately 0:25:41 to 0:30:39 (i.e., roughly 5% of the total runtime). (*Id.* ¶ 40.b.)

### C.      Denims' Livestream Reaction to The Nuke.

On January 31, 2025, Denims conducted a livestream on Twitch in which she watched and reacted to The Nuke in real time before a live audience. (Compl. ¶¶ 70.a–b; *id.* ¶¶ 2, 78 (alleging the challenged use was Denims' so-called "group viewing session" occurring on January 31, 2025).) Denims' livestream reaction to The Nuke ran 3 hours and 52 minutes (*id.* ¶ 70.c)—i.e., more than double The Nuke's length. The livestream is attached to the Complaint as Exhibit K, which is a video file lodged by TEI. It begins at 1:15:35 of Exhibit K and concludes at 5:00:35 of Exhibit K.[2]

TEI alleges Denims displayed The Nuke on screen during her livestream while pausing to offer commentary across each of The Nuke's sections, while interacting with her viewers through a live chat. (*See id.* ¶¶ 70.c–p.) The Complaint itself catalogues numerous instances in which Denims responded to The Nuke's

---

[2] This Motion's reference to Exhibit K is to the corrected version of the exhibit, lodged on April 2, 2026. (*See* ECF No. 34.)

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

observations, disputed its characterizations, criticized its editing and rhetorical choices, and referenced external sources in support of her views. (*Id.* ¶¶ 70.g–m.)

TEI concedes Denims "makes a highly transformative use of The Nuke," stating: "[w]here The Nuke seeks to expose how Hasan radicalizes people online to be antisemitic and anti-Israeli, Denims attempts to use The Nuke for the exact opposite purpose" (*id.* ¶ 70.o).

TEI alleges Denims was eligible to receive paid subscriptions, donations, and ad revenue during the livestream (*id.* ¶¶ 70.p.ii–iv). Notably, TEI does not allege Denims charged viewers to access the livestream. TEI then makes the conclusory allegation that the livestream was "intended (and succeeded) to provide a market substitute for The Nuke" (*id.* ¶ 73), but the Complaint does not allege any facts supporting the claim that any viewer who watched Denims' livestream would have otherwise watched The Nuke on TEI's YouTube channel.

## III.   LEGAL STANDARD

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989) (citing *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 (9th Cir. 1984)); *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) ("Judgment on the pleadings is properly granted when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law.").

Because motions for judgment on the pleadings and motions to dismiss under FRCP 12(b)(6) "are functionally identical, the same standard of review applicable to a Rule 12(b) motion applies to its Rule 12(c) analog." *Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989); *see also id.* ("The principal difference between motions filed pursuant to Rule 12(b) and Rule 12(c) is the time of filing."). Therefore,

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

a motion for judgment on the pleadings "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

When ruling on a motion for judgment on the pleadings, all well-pleaded "allegations of fact by the party opposing the motion are accepted as true." *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988). Courts, however, are "not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018); *see McGlinchy*, 845 F.2d at 810 (9th Cir. 1988) ("[C]onclusory allegations without more are insufficient to defeat a motion to dismiss for failure to state a claim.").[3]

## IV.  THE COURT SHOULD GRANT DENIMS' MOTION FOR JUDGMENT ON THE PLEADINGS

### A.  Applicable Law on Fair Use.

"[T]he 'fair use' doctrine… [is] an 'equitable rule of reason' that 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18 (2021) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)). "[T]he fair use of a copyrighted work… for purposes such as criticism, comment, news reporting, teaching…, scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. The "four non-exclusive factors" courts consider when determining fair use are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;

---

[3] "Judgment on the pleadings may be granted as to fewer than all of the claims, or as to part of a claim." *FEC v. Adams*, 558 F. Supp. 2d 982, 987 (C.D. Cal. 2008) (Fischer, J.); *see, e.g.*, *Solis v. Am. Airlines, Inc.*, 2021 WL 4893247, at *2 (C.D. Cal. July 27, 2021) (Gutierrez, J.) (partial judgment on the pleadings permissible).

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

*Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 451 (9th Cir. 2020) (quoting 17 U.S.C. § 107(1)–(4)); *Google*, 593 U.S. at 19 (the four factors "set forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances, including 'significant changes in technology.'").

Fair use is a "flexible" concept and "its application may well vary depending on context." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527 (2023). "The four statutory fair use factors should not be viewed as discrete questions, isolated from one another, but as interrelated issues contributing to a holistic inquiry." *Romanova v. Amilus Inc.*, 138 F.4th 104, 117 (2d Cir. 2025); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994) ("Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright.").

"[W]hen the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion [for judgment on the pleadings]." *Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1064 (C.D. Cal. 2017). Materials attached to the complaint are incorporated into the complaint and therefore may be considered on a motion for judgment on the pleadings. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("Materials … 'whose contents are alleged in a complaint and whose authenticity no party questions' may be found to be incorporated by reference.").

### B.    Denims' Use of The Nuke Constitutes Fair Use.

#### 1.    The Purpose and Character of The Use Is Highly Transformative, Outweighing Any Incidental Commerciality.

The first factor weighs decisively in favor of fair use. Denims' livestream transformed The Nuke from one-sided advocacy into the subject of live, unscripted

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

debate and criticism that offered her audience a fundamentally different purpose, character, and perspective on the subject matter.

"The first statutory factor examines 'the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes.'" *Dr. Seuss*, 983 F.3d at 451 (quoting 17 U.S.C. § 107(1)). "This factor has taken on a heightened significance because it influences the lens through which [courts] consider two other fair use factors." *Id.* Therefore, "[t]he third factor… 'will harken back' to the first factor…. And the fourth factor, relating to market harm, is influenced by whether [any] commercial use was transformative." *Id.*

"The central inquiry under the first factor is whether the new work is 'transformative.'" *SOFA Ent., Inc. v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278 (9th Cir. 2013); *Dr. Seuss*, 983 F.3d at 452 ("The term 'transformative' does not appear in § 107, yet it permeates copyright analysis…"). "Transformative works 'add [ ] something new' to an existing work, endowing the first with 'new expression, meaning, or message,' rather than 'merely supersed[ing] the objects of the original creation.'" *SOFA*, 709 F.3d at 1278 (alterations in original) (quoting *Campbell*, 510 U.S. at 579). "The second part of the first fair use factor involves whether the new use is commercial—*i.e.*, 'whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.'" *DraftExpress, Inc. v. Whistle Sports, Inc.*, 2022 WL 16962285, at *3 (C.D. Cal. Aug. 2, 2022). Critically, "the more transformative the new work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579.

In the Complaint, TEI alleges Denims' use was "highly transformative." (Compl. ¶ 70.o ("[Denims] makes a highly transformative use of The Nuke" because "[w]here The Nuke seeks to expose how Hasan radicalizes people online to be

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

antisemitic and anti-Israeli, Denims attempts to use The Nuke for the exact opposite purpose…”)).[4] As will be explained below, TEI is correct.

### (a)  Denims' Use of The Nuke Was Highly Transformative.

The Complaint's own allegations—and the livestream itself—confirm Denims' use was highly transformative. In the reaction livestream, Denims, among other things: (1) offered commentary on the Uyghur genocide and Chinese authoritarianism (Compl. ¶ 70.j.ii); (2) challenged TEI's framing of the Houthi movement and the hijacking of the Galaxy Leader (*id.* ¶¶ 70.k.iv, 70.l.vii, 70.l.ix); (3) contested TEI's portrayal of Hezbollah and its former leader Hassan Nasrallah (*id.* ¶¶ 70.i.iv, 70.o.i); (4) disputed TEI's account of the events of October 7th and the evidence of sexual violence (*id.* ¶¶ 70.i.v, 70.l.xiii–xiv); (5) critiqued TEI's discussion of Twitch's enforcement and moderation decisions (*id.* ¶¶ 70.l.xv–xvii, 70.i.vi); (6) offered counter-arguments regarding the relationship between Zionism and Judaism (*id.* ¶ 70.l.xxi); (7) commented on the production quality, editing, and rhetorical techniques of The Nuke itself (*id.* ¶¶ 70.g, 70.h.iv); and (8) even cited extrinsic sources, including a Wikipedia article and video clips, to support her positions (*id.* ¶¶ 70.m.i–ii).

The undisputed purpose of Denims' livestream was to contest, comment on, and also mock TEI's message rather than to just rebroadcast it, which is textbook transformative use. *See, e.g.*, *Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1104 (C.D. Cal. 2015) (“[E]ven if [plaintiff]'s episodes are not parodies, the episodes comment upon or criticize [defendant]'s videos. [Plaintiff]s episodes directly respond to and highlight humorous aspects of [defendant]'s videos. The episodes do so via the host's reactions to the videos, jokes, narration, costumes and graphics.”

---

[4] “Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.” *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

(footnote omitted)); *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 45 (S.D.N.Y. 2017) (reaction video was "quintessential criticism and comment" constituting fair use).[5]

As such, Denims' criticism of The Nuke "is at the heart of the fair use doctrine, and it would lose meaning without reproduction of Plaintiff's video." *Stebbins v. Alphabet Inc.*, 2025 WL 2233208, at *5 (N.D. Cal. July 2, 2025) (reaction piece reproducing entirety of plaintiff's work protected by fair use); *see Warhol*, 598 U.S. at 532 ("[C]ommentary or criticism that targets an original work may have compelling reason to conjure up the original by borrowing from it." (internal quotation marks omitted)).

TEI attempts to minimize this reality by characterizing Denims' reaction as "surface-level" (Compl. ¶ 4.a), "misinformation" (*id.* ¶ 4.c), and "unsubstantiated" (*id.* ¶ 70.l). However, "the fair use inquiry does not ask whether the criticism … of the copyrighted work is just or accurate, or mean-spirited … but simply whether the use is of the kind that copyright is designed to protect." *Hannley v. Mann*, 2023 WL 3407183, at *5 (C.D. Cal. Mar. 8, 2023); W*einberg v. Dirty World, LLC*, 2017 WL 5665023, at *8 (C.D. Cal. July 27, 2017) ("[T]he crux of the Post … was to provide social commentary (albeit unsavory and uncouth) and criticism…. This is the exact type of critique that was [*sic*] falls within the scope of the fair use doctrine.").

Whether Denims' commentary was correct, sophisticated, or to TEI's liking is ultimately irrelevant to the transformative inquiry. *See, e.g.*, *Hosseinzadeh*, 276 F. Supp. 3d at 46 (first factor weighed in favor of fair use because, "[i]rrespective of whether one finds it necessary, accurate, or well-executed," the secondary work is "nonetheless criticism and commentary" on the original work).

Moreover, the inquiry under the first factor focuses on "whether the new work merely supersede[s] the objects of the original creation … (supplanting the original),

---

[5] The Complaint concedes content which "intersperse[s] short segments … with criticism and commentary," like what Denims did here, is generally considered fair use. (*See* Compl. ¶ 1.)

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

or instead adds something new, with a further purpose or different character." *Warhol*, 598 U.S. 508, 528 (2023) (internal quotation marks omitted) (quoting *Campbell*, 510 U.S. at 579); *Peterman v. Republican Nat'l Comm.*, 369 F. Supp. 3d 1053, 1060 (D. Mont. 2019) ("Even an exact copy of a work may be transformative if 'the copy serves a different function than the original work.") (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007)). And when the secondary work has "critical bearing on the substance or style of the original composition," the "claim to fairness in borrowing from [the] work" is at its strongest. *Campbell*, 510 U.S. at 580.

Here, the purposes of The Nuke and Denims' livestream are undeniably distinct, if not diametrically opposed. The Nuke advances a specific editorial message concerning Piker's purported radicalization of his audience with "propaganda." (*See* Compl. ¶¶ 36, 40–40.g.) The spirit of Denims' livestream took that thesis as its target and subjected it to real-time opposition and counterarguments—at times in a mocking manner. TEI concedes this point (at ¶ 70.o) by alleging "Denims attempts to use The Nuke for the exact opposite purpose" of The Nuke's purpose. *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1379 (N.D. Cal. 1995) ("Because [defendant's] use of copyrighted materials served a completely different function than that of the plaintiffs, this factor weighs in [defendant's] favor.").

By extension, when the original work advances an argument and the secondary work exists to challenge it, the two serve different purposes by definition.[6]

The different purpose is equally matched by a fundamentally different viewing experience for Denims' audience. Where The Nuke is a scripted, edited production presenting a linear argument (Compl. ¶ 40), Denims' reaction was a live, unscripted

---

[6] To illustrate by contrast, in *Warhol* the Court found the first factor weighed against fair use because the particular use at issue (i.e., licensing a silkscreen portrait of Prince to a magazine for a feature story) served "substantially the same" purpose as the original photograph, which was also licensed to magazines as a portrait of Prince. *Cf.* 598 U.S. at 534–536. Here conversely, The Nuke was created to persuade, whereas Denims' livestream was created to rebut.

11

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

broadcast in which she offered spontaneous reactions, engaged with her audience through a live chat, and provided real-time commentary interspersed with tangential discussions and cross-talk (*e.g.*, *id.* ¶¶ 70.h.ii–iii, 70.j.i–iii). Denims paused 211 times to offer real-time commentary and criticism. Her reaction ran 235 minutes, almost 2.5x times longer than the original. Some of Denims' pauses ran up to 8 minutes; many ranged between 1 and 5 minutes. Four times, Denims pulled The Nuke down entirely, pulled up other video content, and watched that other content with her audience, commenting along all the while.[7] (*See* Compl., Ex. K; *see also infra* p. 17.)

Courts confronting similar facts have found that this type of live, unfiltered commentary—which is a hallmark of the livestreaming medium—supports a finding of transformative use. *See, e.g.*, *Stebbins*, 2025 WL 2233208, at *5 (livestream reaction a "fundamentally different experience" from original where original was "an edited video" and the livestreams featured "unedited and live reactions," "frequent cross-chatter, and engagement with a live virtual audience"). Like in *Stebbins*, Denims' livestream here served a completely different purpose and provided a fundamentally different viewing experience for her audience than The Nuke. It cannot be genuinely disputed that Denims' reaction livestream made a vastly transformative use of The Nuke.

> **(b)    The *De Minimis* Commercial Nature of Denims' Use Is Incidental and Does Not Outweigh Its Transformative Character.**

Denims' use was not sufficiently "commercial" to outweigh the transformative nature of her use. TEI alleges the use was commercial as Denims was eligible to be paid subscriptions, donations, and advertising revenue during her livestream. (Compl. ¶¶ 70.p.i–iv.) But these allegations carry minimal weight. The "commercial nature of

---

[7] For notable instances of pauses for commentary, reaction, and analysis by Denims, *see, e.g.*, Ex. K at ~4:31:00 to ~4:39:00; ~2:23:00 to ~2:29:00; ~1:52:00 to ~1:57:00; ~3:29:00 to ~3:33:00; ~3:13:00 to ~3:15:00; ~1:48:00 to ~1:50:00; and ~2:50:00 to ~2:51:00.

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

the use is outweighed by the [livestream]'s transformativeness." *Equals Three*, 139 F. Supp. 3d at 1105.

Where, as here, the use is highly transformative, commercialism recedes to the background of the analysis. *See Campbell*, 510 U.S. at 579; *SOFA*, 709 F.3d at 1278–79 ("[B]ecause [defendant]'s use of the clip is transformative, the fact that *Jersey Boys* is a commercial production is of little significance."); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (finding that a work's "commercial qualities become less important" where use is highly transformative); *see also Hustler Mag. Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1152 (9th Cir. 1986) ("Even assuming that the use had a purely commercial purpose, the presumption of unfairness can be rebutted by the characteristics of the use."); *Stebbins*, 2025 WL 2233208, at *5 ("incidental" commerciality "outweighed by the highly transformative nature of the Livestreams"); *see City of Inglewood v. Teixeira*, 2015 WL 5025839, at *8–9 (C.D. Cal. Aug. 20, 2015) (defendant's videos, despite "generat[ing] income," were "quintessential transformative works for the purpose of criticism and commentary[,] [e]ven as used for commercial purpose").

In any event, the commercial aspects of Denims' livestream were incidental at best. Denims is a livestreamer; that is her job. She is always eligible to receive subscriptions, donations, and advertising revenue during her Twitch broadcasts, regardless of content. *Cf. Wall Data Inc. v. Los Angeles Cnty. Sheriff's Dep't*, 447 F.3d 769, 779 (9th Cir. 2006) ("A commercial use 'is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies.'"). The revenue Denims is alleged to be eligible to receive from the reaction livestream was a byproduct of the platform on which she regularly broadcasts, and not the direct product of exploiting The Nuke. *DraftExpress*, 2022 WL 16962285, at *3 ("[T]he commercial use factor concerns 'the

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise.'"").[8]

### 2.   The Documentary and Informational Nature of The Nuke Favors Fair Use.

This second Section 107 factor also strongly weighs in favor of fair use. "[T]he nature of the copyrighted work," 17 U.S.C. § 107(2), "address[es] two aspects of the work: the extent to which it is creative and whether it is unpublished." *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1177 (9th Cir. 2012). "Works that are creative in nature are closer to the core of intended copyright protection than are more fact-based works." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003) (quoting *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1016 (9th Cir. 2001)). Notably, the Ninth Circuit has found that "this factor typically has not been terribly significant in the overall fair use balancing." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997).

In any case, TEI characterizes The Nuke as a "tragi-comic documentary critiquing Hasan and Twitch." (Compl. ¶ 40.) Even if "tragi-comic," the substance of The Nuke is ***overwhelmingly*** documentary and informational; six of its seven sections are devoted almost entirely to real world events and constitute quintessential political discourse. (*Id.*, Exs. D, E; *supra pp.* 3-4.) The Nuke does incorporate edited montages (*id.* ¶ 40), but they indisputably serve the larger informational purpose of the rest of the work. *See SOFA*, 709 F.3d at 1279 (though containing some creative elements, the clip at issue "conveys mainly factual information"); *Righthaven LLC v. Klerks*,

---

[8] The fact that The Nuke and Denims' reaction to it are based on the Israel-Palestine conflict and such matters—which are not only in the public interest but extraordinarily so—weighs in favor of a finding of fair use. *Hustler Mag., Inc. v. Moral Majority, Inc.*, 606 F. Supp. 1526, 1536 (C.D. Cal. 1985), aff'd, 796 F.2d 1148 (9th Cir. 1986) ("[W]hen an act of copying occurs in the course of a political, social or moral debate, the public interest in free expression is one factor favoring a finding of fair use.").

2010 WL 3724897, at *3 (D. Nev. Sept. 17, 2010) (work had "some degree of creativity" but was "primarily informational").[9]

### 3. The Amount Used Was Reasonable and Necessary for Denims' Commentary.

The third factor also weighs in favor of a fair use finding. It asks "whether 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole,' … are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (citations omitted); *see also SOFA*, 709 F.3d at 1279 ("The third factor looks to the quantitative amount and qualitative value of the original work used in relation to the defendant's justification for the use.").

This analysis will "harken back" to the first fair use factor, which strongly weighs towards fair use (*supra* pp. 9-12), because "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87; *see also Hosseinzadeh*, 276 F. Supp. 3d at 46 (third factor considers the proportion of the copyrighted work used "and then how well tailored that use was to the allegedly infringing work's proper purpose—no matter how large or long the allegedly infringing work is."). And "quantity alone is not determinative." *Hosseinzadeh*, 276 F. Supp. 3d at 46. Even copying an entire work does not weigh against fair use "if [the alleged infringer] takes no more than is necessary for his intended use." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013) (citing *Kelly,* 336 F.3d at 820–21); *Mattel*, 353 F.3d at 804 ("[E]ntire verbatim reproductions are justifiable where the purpose of the work differs from the original.").

Here, Denims showed the entirety of The Nuke on "approximately three-quarters" of her screen and her livestream ran approximately 3 hours and 52 minutes. (Compl. ¶¶ 70.n, 73.b; *id.* ¶ 70.c.) As discussed below, Denims prevails on this factor for at least two reasons.

---

[9] The Nuke was also published when Denims conducted her livestream reaction to it, which weighs further in favor of a finding that the second factor tips towards fair use.

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

First, the copying was necessary to accomplish Denims' transformative purpose because the livestream was a real-time critique of The Nuke, not just pieces of it. "[T]o comment on and critique a work, clips of the original may be used," because "[w]ithout using actual clips, the commentary and critique here would lose context and utility." *Hosseinzadeh*, 276 F. Supp. 3d at 46. She could not have offered a running critique of The Nuke – its factual claims, political arguments, rhetorical techniques, and editorial choices – without showing what she was reacting to, and thus her criticism, by its nature, required reference to the original—all of it. *See Stebbins*, 2025 WL 2233208, at *6 (defendant copied "literally every single last second" of the original, but as "[t]he clips of the [original] and the commentators' live reactions thereto were essential to [defendant]'s own creative works because the clips provided context," factor did not weigh against fair use).

And to the extent Denims' livestream parodied or mocked The Nuke (*see, e.g.*, Compl. ¶¶ 70.g, 70.h.iv), fair use allows "tak[ing] a work's heart in order to conjure up the original and achieve [one's] parodic purpose." *Equals Three*, 139 F. Supp. 3d at 1107 (third factor favored fair use even though defendant used "the arguable heart" of the work to achieve critical purpose and "allow the host's jokes, comments, and criticisms to make sense to the viewer and resonate"); *Campbell*, 510 U.S. at 588 ("[P]arody must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable.").

Second, the ratio of commentary to original confirms the copying was well-tailored to a critical purpose. Where The Nuke runs approximately 1 hour and 42 minutes (Compl. ¶¶ 40.a–g & Ex. E), Denims' reaction to it ran nearly ***four hours*** (Compl. ¶ 70.c & Ex. K)—*i.e.*, ***more than double The Nuke's runtime***. The below demonstrative, created by charting the time-stamps from the livestream which is a part of the Complaint, illustrates that the relationship between the original and the reaction aligns with these legal principles and that Denims' commentary and critique did not stop until The Nuke was concluded:

16

**EXHIBIT K**

## Timeline of Uninterrupted Playback vs. Commentary Pauses

Reaction to Content Nuke — Denims

Each blue shaded segment represents a commentary pause by Denims. Gaps represent uninterrupted playback of Content Nuke.

Commentary pauses: 211   |   Total commentary: 2h 11m 22s (7,882 sec)   |   Content Nuke playtime: 1h 43m 24s (6,204 sec)

Full reaction window: 1:15:35 to 5:10:21

End of Content Nuke if played without interruption

1:15:35   1:30:35   1:45:35   2:00:35   2:15:35   2:30:35   2:45:35   3:00:35   3:15:35   3:30:35   3:45:35   4:00:35   4:15:35   4:30:35   4:45:35   5:00:35

■ Commentary / paused (56.0% — 7,882 sec)          □ Playback (44.0% — 6,204 sec)          — End of Content Nuke if played uninterrupted





**Total Original: 1:42:06**                              **Total Reaction: 3:54:46**

The breadth of Denims' engagement and commentary is also reflected in the Complaint's own characterizations of the livestream, which allege Denims' unique reactions to The Nuke on topics from geopolitics to production quality to Twitch's moderation policy. (Compl. ¶¶ 70.d–p.)

The significance of the runtime disparity—despite that The Nuke was shown from beginning to end—is even clearer when viewed through the lens of the first factor as the additional two-plus hours represent time Denims spent pausing to mock and parody The Nuke's rhetorical techniques (*Id.* ¶¶ 70.g, 70.h.iv), respond to her chat (*id.* ¶ 70.a.iv, 70.h.ii, 70.l.xxi), pull up extrinsic sources (*id.* ¶¶ 70.m.i–ii), and engage in extended tangential discussions (*id.* ¶¶ 70.h.ii–iii, 70.j.i–iii). In other words, because "the extent of permissible copying varies with the purpose and character of

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

the use," *Campbell*, 510 U.S. at 586–87, the quantitative "amount" of The Nuke in Denims' livestream is diluted by the volume of her original content surrounding it.

As such, The Nuke was embedded within a far larger work whose predominant content (and length) was Denims' ***own*** commentary. In other words, the use of the full work is thus inseparable from the transformative purpose it serves, because the commentary cannot exist without the material being commented upon. *See Kelly*, 336 F.3d at 821 (finding it "reasonable" to copy entire work where partial copying would have "reduc[ed] the usefulness" of secondary work). Accordingly, "[t]he extensive copying was necessary to the critique." *Stebbins*, 2025 WL 2233208, at *6.

### 4.    Denims' Livestream Does Not Serve as a Market Substitute for The Nuke.

The fourth fair use factor "requires courts to consider the secondary use's impact on the market for the original work and the market for derivative works, including if the defendant's actions became 'unrestricted and widespread.'" *SOFA*, 709 F.3d at 1280. "Where the secondary use is not a substitute for the original and does not deprive the copyright holder of a derivative use, the fourth factor weighs in favor of fair use." *Id.* While this factor may be "the single most important element of fair use," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985), it is settled that "[a] transformative work is less likely to have an adverse impact on the market of the original than a work that merely supersedes the copyrighted work." *Kelly*, 336 F.3d at 821; *Campbell*, 510 U.S. at 591 ("[W]hen… the second use is transformative, … market harm may not be so readily inferred.").

The inquiry is whether the secondary use serves as a "market substitute" for the original. *Campbell*, 510 U.S. at 587. For instance, "a lethal parody, like a scathing theater review, kills demand for the original [but] does not produce a harm cognizable under the Copyright Act." *Id.* at 591–92. "[T]he role of the courts is to distinguish between '[b]iting criticism [that merely] suppresses demand [and] copyright infringement[, which] usurps it.'" *Id.* (quoting *Fisher v. Dees*, 794 F.2d 432, 438 (9th

18

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

Cir. 1986)). "A defendant usurps the original work's market when 'the infringer's target audience and the nature of the infringing content is the same as the original.'" *Hughes v. Benjamin*, 437 F. Supp. 3d 382, 394 (S.D.N.Y. 2020).

TEI alleges Denims "intended (and succeeded) to provide a market substitute for The Nuke" (Compl. ¶ 73), pointing to vague statements by Denims or her viewers suggesting they watched the livestream in lieu of watching The Nuke directly (*id.* ¶¶ 70.a.i–v, 70.p.i), the timing of the livestream relative to The Nuke's release (*id.* ¶ 73.c), and conclusory allegations of lost views and ad revenue (*id.* ¶ 73.e). But this conflates demand suppression with market substitution. Even if Denims' criticism dissuaded viewers from watching The Nuke directly, that is at most "biting criticism that suppresses demand," not "copyright infringement, which usurps it." *Campbell*, 510 U.S. at 592.[10]

Here, Denims' livestream cannot plausibly serve as a market substitute for *The Nuke*. Anyone seeking to watch The Nuke—a scripted, edited, 1 hour and 42 minute documentary presenting a linear argument—would have a totally different experience watching Denims' nearly ***four-hour***, fragmented start-and-stop livestream, which featured relentless spontaneous reaction, live chat interaction, tangential discussions, extrinsic source material, and critical comment throughout. *See, e.g.*, *Stebbins*, 2025 WL 2233208, at *7 ("Anyone seeking to watch the Livestreams would have a fundamentally different viewing experience than a person seeking to watch the Retrospective."); *Hosseinzadeh*, 276 F. Supp. 3d at 47 ("[A]nyone seeking to enjoy [the original] on its own will have a very different experience watching the [reaction] video…."); *Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 651–52 (9th Cir. 2020) ("[A] person wishing to purchase the sheet music for "Magic" in order to play or perform that song would necessarily purchase the sheet

---

[10] Denims' subsequent comments on this issue illustrate the point: "[T]hey wanted to see what someone ***who would disagree*** with [the Nuke] would say." (*Id.* ¶ 70.a.vi.)

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

music for the song itself from the owner of the performance rights—not the sheet music for 'Rainmaker.'"). To this end, the presentation itself is fundamentally distinct, in that the livestream occurred on Twitch—an interactive, chat-centric streaming platform, as opposed to a pre-made YouTube video—and a large section of the screen depicts Denims and her live chat, evidencing on its face the fundamentally "different market function," *Campbell*, 510 U.S. at 591, served by the livestream.

Moreover, the audiences for the two works are not coextensive. It is flatly implausible that viewers who tune in for live rebuttal content might be the same or overlap with the constituency who seek the original documentary, particular given the polarity of both the content (The Nuke, Denims' reaction) and the actors (Klein, Denims). Indeed, by alleging Denims used The Nuke *"for the exact opposite purpose"* (Compl. ¶ 70.o), TEI acknowledges Denims' livestream targeted a fundamentally different audience that was interested in ***criticism*** of The Nuke rather than an endorsement of it.

This concession also flies in the face of TEI's claim of lost views and ad revenue (*id.* ¶ 73.e), which is also simply implausible and which the Court should disregard as conclusory and devoid of facts suggesting a single Denims' viewer would have otherwise watched The Nuke directly. There is no rational basis for TEI's conclusory claim that an audience who tuned in for Denims' critical, scoffing, and "alt-left" leaning reaction would have watched The Nuke directly.[11] For instance, in *Hughes*, the court addressed this exact issue and found that the fourth factor weighed in favor of fair use:

> [Defendant]'s target audience (generally political conservatives and libertarians) is obviously not the same as [plaintiff]'s target audience (generally political liberals).... Moreover, although *SJW Levels of Awareness* is comprised entirely of portions of *We Thought She Would Win*, there is no reason to think that [plaintiff]'s audience will abandon

---

[11] TEI alleges Denims' audience is similar or the same to Piker's, "the most prominent alt-left streamer on Twitch." (*See* Compl. ¶¶ 16-17, 36 (alleging Denims "leach[es] off of [Piker's] audience").)

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

her progressive YouTube channel to watch the derisively-titled *SJW Levels of Awareness* on a conservative YouTube channel simply because it contains parts of her work.

437 F. Supp. 3d at 394 (citation omitted); *Teixeira*, 2015 WL 5025839, at *12 (original work used "exclusively for the purpose of presenting [defendant's] views and commentary on Inglewood city politics.").

Finally, TEI's allegation that Denims' conduct "did become widespread" (Compl. ¶ 73.f) does not change the analysis.[12] Even if the practice of reacting to The Nuke became or were to become sufficiently "unrestricted and widespread" due to Denims' livestream, *Campbell*, 510 U.S. at 590, it remains utterly implausible that the market (or potential market) for The Nuke itself—standing on its own via h3h3Productions' YouTube channel—would be materially affected for the reasons discussed above. This factor weighs in Denims' favor.

///

---

[12] To support this allegation, TEI merely alleges "[s]everal other members of Hasan's Waiting Room conducted a 'group viewing session' of The Nuke immediately after its release." (Compl. ¶ 73.f.) That is not "unrestricted and widespread use," and these separate alleged "sessions" apparently occurred at the same time as Denims' livestream, undermining the claim that Denims' livestream caused any such use.

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

**V.      CONCLUSION**

TEI's claim for direct copyright infringement as to The Nuke fails as a matter of law under the fair use doctrine. Denims respectfully requests that the Court grant her Motion without leave to amend.[13]

DATED: April 17, 2026                    FROST LLP


By: _____
BENJAMIN KASSIS
BENJAMIN GRUSH
DAVID TIRATURYAN
Attorneys for Defendant
ALEXANDRA MARWA SABER p/k/a
DENIMS

---

[13] No amendment could change this result; therefore leave to amend should be denied. *See Haas v. Travelex Ins. Servs. Inc.*, 555 F. Supp. 3d 970, 975 (C.D. Cal. 2021).

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record for Alexandra Marwa Saber certifies that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1, 11-6.2 and Section G.4. of the Court's Standing Order.

DATED: April 17, 2026                 FROST LLP

By: _____
BENJAMIN KASSIS
Attorney for Defendant
ALEXANDRA MARWA SABER p/k/a
DENIMS

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 17, 2026, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court via the Court's CM/ECF system, which will automatically generate and send notice of this filing to all attorneys of record who have appeared in this case and who are registered users of the Court's CM/ECF system. Parties may access this filing through the Court's electronic filing system.

DATED: April 17, 2026                    FROST LLP

By: _____
BENJAMIN KASSIS
Attorney for Defendant
ALEXANDRA MARWA SABER p/k/a DENIMS

24

ALEXANDRA MARWA SABER'S MOTION FOR JUDGMENT ON THE PLEADINGS