Rom Bar-Nissim (SBN: 293356)
Rom@HeahBarNissim.com
**HEAH BAR-NISSIM LLP**
1801 Century Park East, Suite 2400
Los Angeles, CA 90067
Telephone: 310.432.2836

Attorneys for Plaintiff
Ted Entertainment, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TED ENTERTAINMENT, INC., a California Corporation,<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDRA MARWA SABER f/k/a MARWA TALATT ABDELMONEM p/k/a DENIMS, an individual, and DOES 1-10<br><br>Defendants. | Case No.: 2:25-cv-05564-WLH-PD<br><br>*Hon. Wesley L. Hsu*<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**<br><br>Action Filed: June 19, 2025 |

1

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ................................................................................................... 1

II. RELEVANT BACKGROUND ........................................................................... 3

    A.    **TEI and** *The Nuke* ............................................................................. 3

    B.    **Denims and her Copyright Infringement** ......................................... 3

    C.    **H3Snark and its Promotion of Infringement of TEI's Works** ....... 4

    D.    **The H3Snark Mods Promote Denims' Infringing Watch Party** ............................................................................................... 5

    E.    **Denims' Infringing Watch Party** ..................................................... 5

III. LEGAL STANDARD ......................................................................................... 6

IV. ARGUMENT ....................................................................................................... 6

    A.    **Fair Use in General** ........................................................................... 6

    B.    **The First Factor Weighs Against Fair Use** ...................................... 7

    C.    **The Second Factor Weighs Against Fair Use** ................................. 17

    D.    **The Third Factor Weighs Against Fair Use** ................................... 17

    E.    **The Fourth Factor Weighs Against Fair Use** ................................. 19

V. CONCLUSION ................................................................................................... 24

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith,*
  598 U.S. 508 (2023)..........................................................................7, 8, 9, 10, 19

*Bartz v. Anthropic PBC,*
  787 F.Supp.3d 1007 (N.D. Cal. 2025)...........................................................10, 20

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994)...............................................................................................7

*Chosen Figure LLC v. Kevin Frazier Prods., Inc.,*
  795 F.Supp.3d 1232 (C.D. Cal. 2025) ...................................................................6

*De Fontbrune v. Wofsy,*
  39 F.4th 1214 (9th Cir. 2022) ..........................................................................8, 10

*Deveraturda v. Globe Aviation Sec. Servs.,*
  454 F.3d 1043 (9th Cir. 2006) ...............................................................................6

*Elvis Presley Enters., Inc. v. Passport Video,*
  349 F.3d 622 (9th Cir. 2003) ............................................................................9, 18

*Hachette Book Group, Inc. v. Internet Archive,*
  115 F.4th 163 (2d Cir. 2024) ...............................................................................19

*Harper & Row Publishers, Inc. v. Nation Enters.,*
  471 U.S. 539 (1985).................................................................................7, 17, 19

*Hosseinzadeh v Klein,*
  276 F.Supp.3d 34 (S.D.N.Y. 2017) ...........................................9, 10, 13, 14, 18, 19

*Hughes v. Benjamin,*
  437 F.Supp.3d 382 (S.D.N.Y. 2020) ....................................................................24

*Hustler Mag., Inc. v. Moral Majority, Inc.,*
  796 F.2d 1148 (9th Cir. 1986) ................................................................................7

1

*Kadrey v. Meta Platforms, Inc.*,

  788 F.Supp.3d 1026 (N.D. Cal. 2025)...................................................................19

*McGucken v. Newsweek LLC*,

  464 F.Supp.3d 594 (S.D.N.Y. 2020) .......................................................................9

*McGucken v. Pub Ocean Ltd.*,

  42 F.4th 1149 (9th Cir. 2022) ............................................................6, 9, 17, 18, 20

*Monge v. Maya Mag., Inc.*,

  688 F.3d 1164 (9th Cir. 2012) .........................................................................9, 17

*Nat. Fire Protection Assoc., Inc. v. UpCodes, Inc.*,

  753 F.Supp.3d 933 (C.D. Cal. 2024) ...............................................................19, 20

*Penguin Random House LLC v. Colting*,

  270 F.Supp.3d 736 (S.D.N.Y. 2017) .......................................................................8

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,

  602 F.3d 57 (2d Cir. 2010) ...................................................................................6

*Righthaven LLC v. Klerks*,

  2010 WL 3724897 (D. Nev. Sept. 17, 2010)..........................................................17

*SOFA Prods., Inc. v. Dodger Prods.*

  709 F.3d 1273 (9th Cir. 2013) ..............................................................................17

*Stebbins v Alphabet Inc.*,

  2025 WL 2233208 (N.D. Cal. July 2, 2025) .....................................................13, 14

*Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*,

  35 F.4th 695 (9th Cir. 2022) ..................................................................................6

*VHT, Inc. v. Zillow Group, Inc.*,

  918 F.3d 723 (9th Cir. 2019) ................................................................................18

*Webb v. Trader Joe's Co.*,

  999 F.3d 1196 (9th Cir. 2021) ................................................................................6

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

**Statutes**

17 U.S.C. Section 107 ........................................................................................................7

**Other Authorities**

H.R. Rep. No. 94-1476 .....................................................................................................7

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

Plaintiff Ted Entertainment, Inc. ("TEI") respectfully submits its Opposition to the Motion for Partial Judgment on the Pleadings ("Motion")[1] of Defendant Alexandra Marwa Saber p/k/a Denims ("Denims").

## I. **INTRODUCTION**

The Motion must be denied because Denims cannot show she made a fair use of *Content Nuke: Hasan Piker* ("*The Nuke*") at all – let alone as a matter of law. The Motion fails because it ignores material allegations, mischaracterizes others, glosses over the videos at issue and proceeds on a complete misunderstanding of the legal issues in this case.

The central question in this case is ***not if*** Denims commented on *The Nuke*. The question is ***whether its extent was sufficient to justify commercially exploiting The Nuke in its entirety immediately upon its release***.

Denims cannot dispute she commercially exploited *The Nuke* immediately upon its release. Such use presents the greatest threat to the core concern of fair use: substitution. Public interest in *The Nuke* was at its apex immediately before release. Consequently, any unauthorized exploitation at that time posed the greatest risk of siphoning demand away from the original to the secondary user.

The commercial exploitation of a work immediately upon release also undermines the assertion that the work is being used for a fundamentally different purpose. If Denims' primary purpose was to criticize *The Nuke*, there is no reason she had to do so immediately upon *The Nuke's* release before anyone could watch it. To the contrary, her criticism would have benefited from waiting.

Rather, the timing of Denims' exploitation of *The Nuke* reveals her primary purpose: to commercially capitalize on the public interest in *The Nuke*. She achieved this purpose by hosting a watch party of *The Nuke* to siphon views away from the original to herself. Denims even stated as much on multiple occasions and her exploitation of *The Nuke* was fully consistent with those statements. This is

[1] References are to the ECF page number for previous filings.

quintessential commercialism under the first factor and market substitution under the fourth factor.

Denims' failure to comment on significant and substantial portions of *The Nuke* further undermines her claim that her primary purpose was to criticize it. Transformativeness is ***not just a question of if it exists – but its extent***. When, as here, the use's transformativeness is inconsistent, the claim to fair use diminishes significantly. More specifically, it demonstrates that any critical purpose was ancillary to commercially exploiting the work under the first factor. Further, the failure to comment on significant and substantial portions of *The Nuke* shows Denims did not need to show all of it or most of it – let alone immediately upon release – which is manifestly unreasonable under the third factor.

It is also undisputed that the moderators of the H3Snark subreddit (the "H3Snark Mods") directed users of H3Snark ("H3Snarkers") to Denims' watch party and offered it as a substitute for the original. The H3Snark Mods have a history of providing H3Snarkers unauthorized substitutes for TEI's copyrighted works. They even stated that the purpose of doing so is to deprive TEI of views and advertising revenue. The H3Snark Mods also explicitly acknowledged that H3Snarkers wanted to watch *The Nuke* without contributing to TEI's views or ad revenue. This is why they made multiple posts directing H3Snarkers to Denims' watch party, which further establishes market substitution under the fourth factor.

The Honorable Sallie Kim agreed in her April 29, 2026 order denying the H3Snark Mods' motion to quash (the "4/29/26 Order"). It found that TEI alleged ***and*** proved that the H3Snark Mods directed potential viewers of *The Nuke* to view Denims' watch party as a substitute for the original.

Denims' audience even stated that they were viewing her watch party as a substitute for the original. Denims' chat is littered with people thanking her for hosting a watch party of *The Nuke* because, otherwise, they would have watched the official version. Equally telling, Denims' chat demonstrates that there was a massive

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

exodus of viewers immediately after she finished showing *The Nuke*. This reveals that the vast majority of Denims' audience were there to see *The Nuke* and not her criticism of it, which reinforces market substitution under the fourth factor.

Therefore, for the reasons set forth in this Opposition, TEI respectfully requests this Court to deny the Motion.

## II.     RELEVANT BACKGROUND

### A.     TEI and *The Nuke*

TEI is a production company that produces online content, primarily for YouTube, and is owned by Ethan Klein and Hila Klein. Complaint ("Cmpt."), ¶ 12. TEI owns the copyrights to the two works at issue in this case, including *The Nuke*. *Id.*, ¶¶ 36, 38, 41, Exs. E-F.

*The Nuke* is a tragi-comic documentary critiquing Hasan Piker and how he radicalizes his audience to support terrorism against Israelis and hate Jews. Cmpt., ¶ 40; Ex. E.[2] It contains original footage, highly edited montages, parodic skits and archival materials (a significant amount of which is owned by TEI). *Id*. A detailed summary is provided in the Complaint. Cmpt., pp. 30:8-40:3.

Throughout January 2025, Ethan built up public interest in *The Nuke* – including frequently discussing it on TEI's podcast, *The H3 Show*. Cmpt., ¶ 43. On January 31, 2025, TEI broadcast the other work at issue in this case: *The H3 Show #104 – Countdown to Doomsday* (the "*Countdown Episode*"). *Id.*, ¶ 41; Ex. F. It was broadcast immediately before TEI released *The Nuke* and further promoted its release to the public. *Id.*

### B.     Denims and her Copyright Infringement

Denims is a streamer on Twitch and a prolific copyright infringer. Cmpt., ¶ 8. Denims' content comprises of hosting watch parties of entire copyrighted works and showing them without permission and minimal commentary, if any. *Id.*

On February 6, 2022, Denims debated one of the most outspoken critics of

---

[2] There are slight differences between the deposit and broadcast versions of *The Nuke*. Cmpt., ¶ 39; *compare* Ex. D *with* Ex. E.

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

these watch parties. Cmpt., pp. 10:10-18; 11:1-12:17. During the debate, Denims made several damning admissions, including that: (1) her watch parties were "filler content" (*id.*, p. 11:6-13); (2) she felt entitled to the content (*id.*, p. 11:14-16); and (3) she "might not be saying anything" or "walk away from the screen" during her watch parties (*id.*, p. 11:21-26).

Most damning, Denims admitted that her watch parties serve as market substitutes for the original works, stating: (1) "***If someone watches content on someone else's stream, there is a very low likelihood that they're going to go watch it separately and give you the view or the like***"; and (2) "***There's no point of watching something a second time. You already watched it. … [o]nce you watch the video in one place, it's pretty unlikely that you're going to go back and watch it again***." Cmpt., p. 12:20-27.

### C.    H3Snark and its Promotion of Infringement of TEI's Works

H3Snark is a subreddit – *i.e.*, a message board on Reddit – of "fallen fans" of the Kleins. Cmpt., ¶ 21. Despite being "fallen fans," H3Snarkers religiously consume TEI's content (known as "hate-watching"). *Id.*, ¶ 23; Request for Judicial Notice ("RJN"), ¶ 8, Ex. 9 (*i.e.*, the 4/29/26 Order), pp. 9:11-10:10. The H3Snark Mods were keenly aware of H3Snarkers' insatiable appetite for TEI content. *Id.*; Cmpt., ¶ 29. The H3Snark Mods were also aware that H3Snarkers did not want to watch TEI's content on its YouTube channels for the specific purpose of depriving TEI of views and advertising revenue. *Id.*; 4/29/26 Order, pp. 9:11-10:10.

The H3Snark Mods provided the H3Snarkers multiple methods to infringe TEI's content. They supplied H3Snarkers links to TEI content on "YewTube" – a website providing unauthorized access to YouTube videos that deprives the original of views and advertising revenue. Cmpt., pp. 17:19-21:9. The H3Snark Mods provided these links in posts they created on H3Snark and in the H3Snark live chat during the live broadcast of TEI content. *Id.* The H3Snark Mods also provided instructions on how to download TEI's paywalled content so that it could be

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

reposted on H3Snark – which H3Snarkers did. *Id.*, pp. 21:10-28, 22:12-17.

### D.      **The H3Snark Mods Promote Denims' Infringing Watch Party**

The H3Snark Mods engaged in similar conduct regarding *The Nuke*. On January 30, 2025 (*i.e.*, the day before *The Nuke* was publicly released), the H3Snark Mods made a pinned community post visible to all H3Snarkers regarding *The Nuke*. Cmpt., p. 40:15-27, Ex. G. They acknowledged that H3Snarkers wanted to see *The Nuke* – albeit a pirated version – by stating: "***Hey everyone, we've seen a lot of comments about wanting to watch the nuke without showing support for H3***." *Id.* (emphasis added). The H3Snark Mods provided a list of streamers, including Denims, with links to their pages as a substitute for watching the original. *Id.*; 4/29/26 Order, pp. 9:11-10:10.

On January 31, 2025, the H3Snark Mods made another pinned community post visible to all H3Snarkers entitled: "***DENIMS is LIVE reacting now to today's H3 podcast episode and the 'content nuke' video Ethan is publishing in an hour***." Cmpt., p. 41:9-16; Ex. I (original and added emphasis). The post contained a picture of Denims that linked directly to her page where she was streaming the *Countdown Episode* (and subsequently *The Nuke*). *Id.* Shortly thereafter, the H3Snark Mods made another pinned community post visible to all H3Snarkers regarding various watch parties for *The Nuke*. *Id.*, p. 40:28-41:8, Ex. H. The post featured Denims at the top of the list of places "to watch reactions to this video" (*i.e.*, *The Nuke*) with a link to her watch party on Twitch in bold. *Id.*

### E.      **Denims' Infringing Watch Party**

Denims' stream from January 31, 2025 is comprised almost entirely of third-party content (*see generally* Exs. J-K) – most of which is TEI's content used without permission. Ex. J beginning at 3:36:47; Ex. K. Prior to *The Nuke's* release, Denims promoted her watch party of *The Nuke* in various ways.  Cmpt., pp. 49:1-3, 49:7-9, 51:23-27; Ex. J at 4:48:38-4:48:48; Ex. K at 0:00:34, 00:23:40-47. The details of Denims' watch party are discussed in greater detail in TEI's fair use analysis.

## III.    LEGAL STANDARD

A motion for judgment on the pleadings is "functionally identical to Rule 12(b)(6) motions." *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1201 (9th Cir. 2021) (internal quotation marks omitted). For both motions, "courts must consider the complaint in its entirety, as well as other sources [including] documents incorporated into the complaint by reference and matters of which a court may take judicial notice." *Id.*

The Motion must be denied unless "there is no issue of material fact, and the moving party is entitled to judgment as a matter of law." *Unite Here Local 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695, 700 (9th Cir. 2022). To make this determination, "[a]ll allegations of fact by [TEI] are accepted as true, and are construed in the light most favorable to [TEI]." *Id.* The Motion may be granted "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Deveraturda v. Globe Aviation Sec. Servs.*, 454 F.3d 1043, 1046 (9th Cir. 2006).

"Fair use is a mixed question of law and fact." *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1158 (9th Cir. 2022). "Fair use is thus often resolved at summary judgment" and not a motion for judgment on the pleadings. *Id.* Only when there are "no material, historical facts at issue and the parties dispute only the ultimate conclusions to be drawn from those facts" can a court "draw those conclusions without usurping the function of the jury." *Id.* Further, "the works themselves supersede and control any contrary descriptions of them[.]" *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010).

## IV.    ARGUMENT

### A.    Fair Use in General

"The fair use doctrine confers a privilege on people other than the copyright owner to use the copyrighted material in a ***reasonable manner*** without [the owner's] consent[.]" *Chosen Figure LLC v. Kevin Frazier Prods., Inc.*, 795 F.Supp.3d 1232,

6

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

1246 (C.D. Cal. 2025) (emphasis added) (quoting *Hustler Mag., Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1151 (9th Cir. 1986)). Fair use is codified in 17 U.S.C. Section 107, which sets forth four non-exclusive factors to evaluate fair use:

> 1. [T]he purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> 2. [T]he nature of the copyrighted work;
> 3. [T]he amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> 4. [T]he effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107

Fair use "is not to be simplified with bright-line rules" and requires a "case-by-case analysis." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). Indeed, "each case raising the question must be decided on its own facts." *Harper & Row Publishers, Inc. v. Nation Enters.* ("*Harper*"), 471 U.S. 539, 560 (1985) (quoting H.R. Rep. No. 94-1476, p. 65 (1976)). Moreover, "its application may well vary depending on context." *Andy Warhol Found. For the Visual Arts, Inc. v. Goldsmith* ("*Warhol*"), 598 U.S. 508, 527 (2023).

Ultimately, the fair use inquiry must be weighed "in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. The Copyright Act "reflects a balance of competing claims upon the public interest: Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Warhol*, 598 U.S. at 526.

### B.    The First Factor Weighs Against Fair Use

The first factor "relates to the problem of substitution" – *i.e.*, whether the secondary use "supersedes" or "supplant[s]" the original. *Warhol*, 598 U.S. at 527. The "central question" is whether the secondary use "adds something new, with a further purpose or different character." *Id.* at 528. The mere fact that a secondary use has "some further purpose" or "add[s] something new … does ***not*** render such uses fair." *Id.* at 528-529 (emphasis added). Rather, "whether an allegedly infringing use has a further purpose or different character" is "a ***matter of degree***, and the degree of

---

7

difference *must* be weighed against other considerations, like commercialism." *Id.* at 532 (emphasis added). When, as here, "the purposes of the works *overlap,*" the secondary use does "not serve an '*entirely different function*'" than the original, which weighs against fair use. *De Fontbrune v. Wofsy*, 39 F.4th 1214, 1225 (9th Cir. 2022) (emphasis added).

The "first factor also relates to the justification for the use" both in the "broad" and "narrower sense." *Warhol*, 598 U.S. at 531-532. A use is justified in the "broad sense" if it has a "distinct purpose" that "furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create." *Id.* at 531. A use is justified in the "narrower sense" when it "is reasonably necessary to achieve the user's new purpose." *Id.* Such justification is "particularly relevant to assessing fair use" where "*wide dissemination of a secondary work would otherwise run the risk of substitution for the original*[.]" *Id.* (emphasis added). Again, "the question of justification is one of *degree*." *Id* (emphasis added).

Even uses set forth in the statute's preamble (like criticism and commentary) "are *not entitled to a presumption of fairness*." *Warhol*, 598 U.S. at 532 fn. 7 (emphasis added). To qualify as transformative criticism, "each quoted passage" must serve "a different purpose (an object of criticism)" than the original. *Id.* at 528 fn.4. Consequently, "a court must consider *each use within the whole* to determine whether the copying is fair." *Id.* (emphasis added).

The first factor does *not* favor fair use when "*a defendant copies more than is necessary to facilitate 'comment or criticism.'*" *Penguin Random House LLC v. Colting*, 270 F.Supp.3d 736, 751 (S.D.N.Y. 2017) (emphasis added). "The law is clear that, to be considered transformative criticism, the aspects of a work that reproduce another's protected expression *must be in service of commentary on that work*. It is *not enough for part* of a work to have a transformative purpose." *Id.* (emphasis added).

Further, when "clips are played without much interruption, if any" or "used in excess of [the] benign purpose," such uses fail to sufficiently transform a work. *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 628-629 (9th Cir. 2003).[3] Additionally, "wholesale copying sprinkled with [spoken] commentary" is "at best minimally transformative." *Monge v. Maya Mag., Inc.*, 688 F.3d 1164, 1174, 1176 (9th Cir. 2012) (same). Also, "voice-overs do not necessarily transform a work." *Elvis*, 349 F.3d at 628. Nor does "token commentary" transform a work. *McGucken v. Newsweek LLC*, 464 F.Supp.3d 594, 606 (S.D.N.Y. 2020).

Most important, when "the commentary has ***no critical bearing on the substance or style of the original*** composition, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." *Warhol*, 598 U.S. at 530-531 (emphasis added).

Moreover, the degree to which a secondary use has a different purpose or character "must be weighed against other considerations, like commercialism." *Warhol*, 598 U.S. at 525. "The undisputed commercial character of [the defendant's] use, though not dispositive, tends to weigh against a finding of fair use." *Id.* at 537. ***Fair use "does not" favor "any user who wants to reach different buyers, in different markets, consuming different products***." *Id.* at 548 fn. 22 (emphasis added).

Commercialism examines "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise." *Elvis*, 349 F.3d at 627. If the defendant "is ***not*** advertising a scholarly critique or historical analysis, but instead ***seeks to profit at least in part from the inherent entertainment value"*** of the original, the use is commercial. *Id.* at 628.

*Hosseinzadeh v. Klein* provides useful guidance because it expressly

_____

[3] *Elvis* was overruled on other grounds as noted in *McGucken*, 42 F.4th at 1158.

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

addresses fair use in the context of reaction videos. 276 F.Supp.3d 34 (S.D.N.Y. 2017). As the court noted, reaction videos "***vary widely in terms of purpose, structure, and the extent to which they rely on potentially copyrighted material***." *Id.* at 40 fn. 1 (emphasis added). Reaction videos that "intersperse **short segments** of another's work with criticism and commentary" are considered a fair use. *Id.* (emphasis added) When a reaction video is more "***akin to a group viewing session***," it is not considered fair use. *Id.* (emphasis added).

Here, Denims' use of *The Nuke* was more "akin to a group viewing session" (*i.e.*, a watch party) that did not serve an "entirely different function" from the original. *Hosseinzadeh*, 276 F.Supp.3d at 40 fn.1; *De Fontbrune*, 39 F.4th at 1225. Denims herself stated that her purpose was to host a "watch party" of *The Nuke* and siphon views away from the original to herself. What "a copyist ***says or thinks or feels*** matters only to the extent it shows what a copyist in fact ***does*** with the work." *Bartz v. Anthropic PBC*, 787 F.Supp.3d 1007, 1026 (N.D. Cal. 2025) (original emphasis) (citing *Warhol*, 598 U.S. at 533, 544-45).

Denims' statements demonstrating her purpose was to host a watch party of *The Nuke* include: (1) titling her broadcast as a "***watch party***" of *The Nuke* (Cmpt., p. 51:20-22); (2) displaying a chyron on her screen that she was "***Watching***" *The Nuke* (*id.*, pp. 51:28-52:3; Ex. K at 1:15:03)); (3) when asked by a chatter, Denims stated she was "***watching***" *The Nuke* (Cmpt., p. 52:4-6; Ex. K at 2:06:09-23); and (4) stating at the end of her watch party that she "did not want to ***watch***" *The Nuke* by herself. Cmpt., p. 52:12-14; Ex. K at 5:08:04-09.

Denims' statements demonstrating her purpose was to siphon views away from *The Nuke* to herself include: (1) telling a chatter "***If you want to enjoy it, you know, come enjoy the watch party somewhere else***" (Cmpt., p. 49:7-9; Ex. K at 23:40-47); (2) reading a chatter stating: "***We're relying on you to stay live so we don't give more views to The Nuke***" and responding that she was "going to stream it" (Cmpt., p. 51:23-27; Ex. J at 4:48:38-4:48:48); (3) immediately after her watch

party of *The Nuke*, stating "***if you enjoyed not giving any views to that terrible video, subscribe, throw a prime, if you like the content, if you enjoyed your time here***" (Cmpt. p. 52:9-11; Ex. K at 5:07:45-58); and (4) the day after her watch party, Denims acknowledged that she knew "***all of those people didn't want to give the video another view***" which is "why they ***watched*** it with" her. Cmpt., p. 52:15-22; Ex. L.

Denims' use of *The Nuke* was fully consistent with her statements. The timing of Denims' watch party evidences her purpose. Denims began her watch party of *The Nuke* one minute after its release when public interest in the work was at its apex. Cmpt., p. 53:1-9; Ex. K. at 1:15:19. This belies Denims' assertion that she used *The Nuke* solely or primarily to criticize it. If this were true, Denims would have viewed *The Nuke* beforehand, outlined and researched her criticisms and selected the portions she wanted to critique. Instead, Denims hosted a watch party of *The Nuke* immediately after its release because she knew individuals wanted to see it in its entirety without watching (and financially supporting) the original.

Denims' statements that she was hosting a watch party of *The Nuke* is reinforced by the 74 separate occasions where Denims played *The Nuke* uninterrupted for 30 seconds or longer (27 instances being over a minute and one even over two minutes).[4] In total, these excerpts comprise over 70 minutes of *The*

---

[4] Cmpt., pp. 53:18-56:22; Ex. K. at 1:15:38-1:16:09, 1:16:56-:1:19:10. 1:19:33-1:20:59, 1:21:41-1:22:11, 1:24:12-1:25:14, 1:25:43-1:27:28, 1:36:01-1:37:10, 1:37:44-1:38:15, 1:39:16-1:39:55, 1:41:47-1:43:05, 1:46:59-1:48:12, 1:48:18-1:49:15, 1:57:33-1:58:07, 1:58:51-2:00:37, 2:00:58-2:01:29, 2:01:56-2:02:45, 2:03:41-2:04:07, 2:06:24-2:07:27, 2:11:07-2:12:01, 2:12:26-2:13:04, 2:13:30-2:14:20, 2:16:19-2:17:08, 2:17:16-2:18:00, 2:18:15-2:19:40, 2:20:34-2:22:20, 2:29:01-2:31:19, 2:32:01-2:33:00, 2:33:32-2:35:10, 2:39:46-2:41:04, 2:42:04-2:43:53, 2:45:04-2:45:35, 2:45:47-2:47:04, 2:47:26-2:47:56, 2:48:04-2:49:50, 2:51:20-2:52:29, 2:57:25-2:58:13, 2:59:23-3:00:39, 3:04:52-3:05:36, 3:06:16-3:07:17, 3:10:42-3:11:21, 3:12:02-3:12:57, 3:16:59-3:17:46, 3:17:49-3:18:20, 3:24:15-3:25:32, 3:25:48-3:26:53, 3:28:23-3:29:49, 3:36:27-3:37:38, 3:40:15-3:40:55, 3:41:29-3:42:48, 3:44:41-3:45:33, 3:48:32-3:49:12, 3:51:04-3:53:45, 3:56:03-3:56:56, 3:59:16-3:59:50, 4:00:44-4:02:23, 4:12:58-4:13:32, 4:19:37-4:20:09, 4:21:51-4:22:36, 4:23:49-4:24:30, 4:25:57-4:26:30, 4:28:24-4:29:10, 4:36:07-4:36:47, 4:38:05-4:39:40, 4:39:47-4:40:25, 4:41:17-4:42:12, 4:43:11-4:44:23, 4:45:39-4:46:11, 4:46:49-4:47:32, 4:47:52-4:48:30, 4:52:41-4:53:41, 4:54:53-4:55:31, 5:00:50-5:01:36, 5:04:00-4:04:31, 5:05:24-5:06:20.

---

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

*Nuke – i.e.*, 70% of its total runtime.

Indeed, despite playing *The Nuke* in its entirety, Denims failed to address significant and substantial portions of *The Nuke*. Cmpt., pp. 57:13-58:27 (summarizing what Denims failed to address in *The Nuke*). Denims even admitted that she was refraining from providing commentary to avoid pausing *The Nuke* for extended periods of time so she could expedite her watch party. Cmpt. p., 57:1-12; Ex. K at 3:00:53-3:01:36, 3:01:49-3:02:09

Worse still, her statements frequently had no critical bearing (or minimal critical bearing) on the style or substance of *The Nuke*. Examples include: (1) making incoherent and unclear utterances;[5] (2) conversing with her chat about topics completely unrelated or only minimally related to *The Nuke*;[6] (3) discussing unrelated or minimally related topics;[7] (4) providing brief superficial comments with little elaboration;[8] (5) expressing confusion at what was depicted in *The Nuke*;[9] (6) going on long unrelated tangents that have nothing to do with the style or substance of *The Nuke*;[10] and (7) playing third-party clips (including TEI clips) uninterrupted for long periods of time without commentary.[11]

The structure of Denims' watch party further emphasizes criticism was ancillary to her primary purpose of hosting a watch party. Denims let substantial portions of *The Nuke* play with little interruption and only provided brief statements

[5] Cmpt., 59:9-12; *see e.g.,* Ex. K at 1:19:11-15, 1:21:00-07, 1:22:12-14, 2:12:02-04, 2:14:55-56, 2:37:05-14, 2:47:57-2:48:03, 3:24:35-3:25:14, 4:24:47-56, 4:31:01-18, 4:52:36-40.
[6] Cmpt., p. 59:13-17; *see e.g.,* Ex. K at 3:19:42-3:20:19, 3:20:24-34, 3:23:35:3:24:14, 3:29:45-3:30:14, 3:37:46-50, 3:38:52-3:39:12, 3:43:41-55, 3:48:13-16, 3:50:15-30, 3:50:44-3:51:03, 4:02:32-35, 4:21:34-50, 4:22:37-52, 4:31:40-53, 4:34:14-44, 4:42:17-19.
[7] Cmpt., p. 59:18-28; *see e.g.,* Ex. K at 1:37:37-43, 1:38:23-33, 1:58:48-50, 2:06:05-08, 2:39:09-45, 2:45:36-46, 3:01:37-48, 4:20:10-32, 4:32:58-4:33:06, 4:35:39-4:36:06, 4:40:58-4:41:07, 4:46:35-38.
[8] Cmpt., p. 60:1-12; *see e.g.,* Ex. K at 1:21:14-40, 1:46:42-50, 2:03:28-30, 2:16-17-18, 2:17:09-15, 2:19:41-2:20:03, 2:41:05-07, 3:46:23-37, 3:59:51-56, 4:30:29-30, 4:43:56-4:44:08, 4:57:40-51, 5:04:58-5:05:23).
[9] Cmpt., p. 60:13-16; *see e.g.,* Ex. K at 1:38:34-1:39:16-55, 1:41:47-1:43:22, 1:46:59-1:48:17, 3:03:21-49, 3:40:15-3:41:28, 4:38:0504:39:40).
[10] Cmpt., p. 62:3-19; *see e.g.,* Ex. K at 1:22:40-1:24:11, 1:25:43-1:35:51, 4:14:35-4:19:36).
[11] Cmpt., pp. 75:9-14, 75:18-76:1; *see e.g.,* Ex. K 2:54:25-2:57:24,  2:22:44-2:29:00.

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

afterwards. *See e.g.*, Ex. K at 2:13:30-2:23:12, 2:39:50-2:49:52, 2:51:20-3:00:55, 4:39:07-4:46:12.

Case law is clear: to qualify as a fair use, a reaction video must consistently play short clips of the original that are followed by significant and substantial amounts of commentary on the work. *Stebbins v. Alphabet Inc.* provides useful guidance. 2025 WL 2233208 (N.D. Cal. July 2, 2025). The court noted that the defendant played the original video "for *seconds at a time* before pausing to respond and critique" the original. *Id.*, *4 (emphasis added). Employing this method, the defendant turned the original "*90-minute* video" into a "*14 hours* commentary" on the original. *Id.* (emphasis added). In other words, the ratio of commentary on the work relative to the amount used from the original was *8.33:1*.

*Hosseinzadeh* emphasizes this point. In the aggregate, the reaction video at issue used "three minutes and fifteen seconds of the five minute, twenty-four second long" original video – *i.e.*, approximately 60% of the original. *Hosseinzadeh*, 276 F.Supp.3d at 40.  The reaction video, however, was "almost fourteen minutes long" and "intersperse[d] relatively *short segments* of the [original] video with *long segments* of ... commentary." *Id.* (emphasis added). In other words, the ratio of original commentary on the work to the amount used from the original was *3.3:1*.

Denims' watch party of *The Nuke* bears no resemblance to the uses at issue in *Stebbins* and *Hosseinzadeh*.[12] During her watch party, Denims' played (and at times replayed) *The Nuke* for 1:43:24 and everything else (irrespective of whether Denims was commenting on or critiquing *The Nuke* or even speaking) comprised 2:07:51. Ex. K at 1:15:34-5:06:50.[13] In other words, the ratio of "everything else" to *The Nuke* is a paltry *1.23:1*. Even worse, as demonstrated above, (1) significant portions of the "everything else" comprised of Denims *not* commenting or criticizing *The Nuke*; and (2) Denims would frequently let long portions of *The Nuke* play

---

[12] To further illustrate how Denims' use stands in stark contrast to *Hosseinzadeh*, TEI submitted the two works at issue in that case. RJN, ¶¶ 1-2, Exs. 1-4.
[13] While Denims' broadcast continues after this timestamp, her statements have hardly anything to do with *The Nuke*.

uninterrupted and provide only brief responses. In other words, the true ratio of commentary to the original was *less* than the duration of *The Nuke*. This further emphasizes that the *extent* of Denims' commentary was insufficient to justify showing *The Nuke* in its entirety immediately upon release.

Further distinguishing *Stebbins* and *Hosseinzadeh* from the present case is the timing of the secondary use. In *Stebbins*, the original work was posted on October 13, 2019 and the secondary work was posted *nearly two years later* on September 12 and 15, 2021. 2025 WL 2233208, *1. In *Hosseinzadeh*, the original work was posted on August 11, 2013 and the secondary use was posted *two and a half years later* on February 15, 2016. *Hosseinzadeh*, 276 F.Supp.3d at 40; RJN, ¶ 2, Ex. 3. Unlike those cases, Denims' secondary use occurred *immediately after The Nuke's release* when public interest and the risk of substitution was at its apex.

Moreover, Denims was keenly aware that her watch parties serve as substitutes for the original. She acknowledged that her watch parties involve "curating" content from YouTube for her audience on Twitch. Cmpt., pp. 11:17-12:16. More damning, Denims admitted that her watch parties serve as substitutes for the original. *Id.*, p. 12:17-27. Therefore, Denims knew and intended her watch party of *The Nuke* to serve as a substitute for the original.

The findings of the 4/29/26 Order reinforce that Denims' purpose was to deprive TEI of views. In determining that TEI made a *prima facie* showing that the H3Snark Mods were contributory liable for Denims' infringement,[14] the Court found that: (1) it "appears that the *entire purpose* of watching Denims' watch party was to *watch TEI's programming in a manner that did not benefit TEI*;" and (2) "the *entire purpose* of Denims' watch party was to 'hatewatch' TEI's works *without giving any benefit to TEI*."[15] 4/29/26 Order, pp. 9:11-10:10 (emphasis added).

[14] The 4/29/26 Order declined to analyze whether Denims' made a fair use of either work at issue in this case. 4/29/26 Order, p. 8:15-22. However, the 4/29/26 Order's findings are probative of the first and fourth fair use factors.

[15] "A hatewatched show is one the viewer genuinely despises but cannot stop watching." 4/29/26 Order, p. 10:2-3.

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

Finally, Denims' use was highly commercial as evidenced by: (1) advertising her watch party of *The Nuke* beforehand on her stream (and not her critique of it); (2) her statements soliciting subscriptions; (3) the 174 separate instances where she received subscriptions, donations and bits; and (4) running advertisements on her watch party and receiving ad revenue. Cmpt., pp. 48:19-49:9; 76:6-22.

Denims' Motion completely fails to address the points raised above. Instead, she relies on mischaracterizations that are easily refuted by examining the underlying cited material. While TEI will not play whack-a-mole with each mischaracterization, it will highlight the most egregious examples below.

First, Denims claims that TEI admitted her watch party was "highly transformative." Motion, pp. 9:24-10:2. Not only did Denims deny this allegation in her Answer (Dkt. No. 19, ¶ 70), she omits the material parts of the allegation: "Denims *(albeit infrequently and inconsistently)* makes a highly transformative use of *The Nuke* [but] [t]he transformative nature of these moments are ***undermined (if not erased) by showing far more of The Nuke than is necessary to achieve this purpose***." Cmpt., pp. 74:21-75:2 (emphasis added).

Second, Denims "summary" of various allegations from the Complaint to claim she commented on *The Nuke* is wildly inaccurate. Motion, 16-6:16. Most egregious is Denims claim the Complaint admits she commented on the Uyghur genocide and Chinese authoritarianism. *Id.*, p. 16:6-7. The Complaint states the ***opposite***: that Denims went on "long and completely unrelated tangents that have nothing to do with the style or substance of *The Nuke*" – including a ten minute "rambling diatribe about: (1) that no one cares about the Uyghurs; (2) western media; (3) the United States is worse than China; (4) falsely stating that disabled Americans lose disability benefits when they get married; (5) incarceration levels in the United States; and (6) the treatment of transgender individuals in the United States." Cmpt., p. 63:3-5, 63:11-16; Ex. K 1:25:43-1:35:51.

Third, Denims' focus on the number of "pauses" during her watch party is

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

incredibly misleading. Motion, p. 19:3-4. Whether Denims' paused *The Nuke* 211 times (which she does not substantiate) is irrelevant;[16] what she did during those pauses is what is relevant. As demonstrated above, Denims: (1) failed to consistently comment on the style or substance of *The Nuke* and frequently discussed unrelated topics; and (2) failed to consistently provide commentary longer than the prior excerpt shown.  Even worse, Denims identifies only seven "notable pauses" (*i.e.*, 3% of the total purported pauses) and still failed to explain how she commented on or critiqued *The Nuke* during those moments.[17] *Id.*, p. 19 fn. 7.

Fourth, Denims misconstrues why the Complaint points out her numerous factual errors. Motion, p. 17:10-23. The Complaint explains that the numerous factual errors show that Denims' primary purpose was – not to critique *The Nuke* – but to provide a watch party of it immediately upon release. If the opposite were true, Denims would have taken the time to watch *The Nuke* beforehand, compile her critiques, substantiate them and only show the portions she intended to critique. Cmpt., pp. 63:19-25; 73:4-8. The reason why Denims failed to do so is clear: she wanted to capitalize on the intense public interest in *The Nuke* by providing a substitute immediately upon release and any criticism was an afterthought.

Finally, Denims' argument that her use was not commercial also fails. Putting aside that her use of *The Nuke* was not sufficiently and consistently transformative to justify her highly commercial use, Denims' claim that the commercial aspects are incidental is easily refuted. Motion, pp. 19:21-20:26. Denims' entire business model

[16] Denims' unauthenticated barcode of pauses is inaccurate and highly misleading because it does not capture: (1) the exact timestamps; (2) whether Denims paused to comment on the style or substance of *The Nuke* or discuss something unrelated; or (3) whether Denims was even speaking at all. Motion, p. 24. Regardless, it still reveals significant portions of Denims' watch party where she played *The Nuke* with little to no interruption.

[17] The seven "notable pauses" warrant closer examination. Not only are the timestamps inaccurately inflated (sometimes materially so), many are only a minute or two in duration, involve Denims' uncritically playing third-party content uninterrupted for several minutes, come after playing long sections of *The Nuke* uninterrupted and/or involve Denims going off on tangents unrelated to the style or substance of *The Nuke*. It is also notable that these seven pauses total approximately 27 minutes – *i.e.*, 21% of time not devoted towards playing *The Nuke* – and highlights the unevenness of Denims' criticism.

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

relies on the unauthorized commercial exploitation of copyrighted works. Nearly the entirety of Denims' January 31, 2025 stream comprises rebroadcasting third-party copyrighted works with minimal commentary for commercial gain (*see generally* Ex. J-K), the vast majority comprises of rebroadcasting TEI's copyrighted works with minimal commentary.[18] Ex. J beginning at 3:36:47; Ex. K.

Therefore, the first factor weighs against fair use.

### C.      The Second Factor Weighs Against Fair Use

The second fair use factor examines "the extent to which [*The Nuke*] is creative and whether it is unpublished." *McGucken*, 42 F.4th at 1161. Even if *The Nuke* "document[s] a real event," it is still "creative because [it is] the product of many technical and artistic decisions." *Id.* Whether a work is published is defined by whether the author exhausted the "right to control the first public appearance" of the work. *Monge*, 688 F.3d at 1178. The mere fact a work is published "does not weigh in favor of fair use." *McGucken*, 42 F.4th at 1162.

Here, the fact that *The Nuke* was released ***one minute prior*** to Denims' watch party does not weigh in her favor. Cmpt., p. 53:1-9; Ex. K. at 1:15:19. To the contrary, Denims' use substantially interfered with TEI's right to control the first public appearance of *The Nuke* because she commenced her watch party before anyone could watch it on their own. Further, while containing numerous documentary and factual elements, *The Nuke* is a creative work because it contains numerous and significant creative elements.[19] Cmpt., 30:1-39:3; Ex. E.

Therefore, the second factor weighs against fair use.

### D.      The Third Factor Weighs Against Fair Use

The third factor examines "the quantitative amount and qualitative value of

---

[18] The Motion's "public interest" argument was rejected by the Supreme Court. *Compare* Motion, p. 21, fn. 14 *with Harper*, 471 U.S. at 559.

[19] Denims' citations to the contrary are inapposite. Motion, p. 21:16-21; *SOFA Prods., Inc. v. Dodger Prods.*, 709 F.3d 1273, 1277 (9th Cir. 2013) (seven second clip of Ed Sullivan saying: "Now ladies and gentlemen, here, for all the youngsters in the country, the Four Seasons"; *Righthaven LLC v. Klerks*, 2010 WL 3724897, * (D. Nev. Sept. 17, 2010) (news article).

the original work used in relation to the justification for that use." *McGucken*, 42 F.4th at 1162. Consequently, this "factor circles back to the first factor because the extent of permissible copying varies with the purpose and character of the use." *Id.*

When "the amount used is substantial with respect to the infringing work, it is evidence of the value of the copyrighted work." *Elvis*, 349 F.3d at 630. Indeed, "[c]opying an entire work militates against a finding of fair use." *VHT, Inc. v. Zillow Group, Inc.*, 918 F.3d 723, 744 (9th Cir. 2019). If, however, "the new user ***only copies as much as necessary for his or her intended use***, this factor will not weigh against the new user." *Elvis*, 349 F.3d at 630 (emphasis added).

Here, Denims used the entirety of *The Nuke* but failed to comment on significant and substantial portions of it. Cmpt., pp. 57:13-58:27 (summarizing portions of *The Nuke* Denims failed to address); Section IV.B. Therefore, her use was clearly excessive for any potential critical purpose.

Denims makes a series of bizarre arguments regarding this factor. Denims argues she had to use *The Nuke* in its entirety, otherwise, her critique would have lost context and utility. Motion, p. 23:4-12. Given Denims' failure to critique significant and substantial portions of *The Nuke*, this argument is fallacious on its face. Denims repeatedly admits that her supposed contribution was engaging in "extended tangential discussions" – *i.e.*, discussion completely unrelated to *The Nuke*. *Id.*, pp. 19:2-3, 24:26-27 26:17-18. Further, Denims focus on the number and duration of her pauses relative to playing *The Nuke* backfires. *Id.*, p. 19:2-6 As demonstrated in Section IV.B, the ratio is paltry compared to the 3.3:1 ratio in *Hosseinzadeh* and the 8.3:1 ratio in *Stebbins* and does not take into account Denims' failure to consistently comment on the style or substance of *The Nuke* when she did pause it.[20]

In sum, Denims' commentary would ***not*** have lost "context and utility" if she used a significantly smaller portion of *The Nuke* because "the 'extent' and 'quality

---

[20] Denims also asserts that she made a "parody" of *The Nuke* but fails to explain how she parodied it. Motion, p. 23:13-20.

and importance'" used from the original was *not* "plainly necessary to the commentary and critique." *Cf. Hosseinzadeh*, 276 F.Supp.3d at 46.

### E. The Fourth Factor Weighs Against Fair Use

The fourth factor is "undoubtedly the single *most important* element of fair use." *Harper,* 471 U.S. at 566 (emphasis added). "While the first fair use factor considers whether and to what extent an original work and secondary use have substitutable purposes, the fourth factor focuses on actual or potential market substitution." *Warhol*, 598 U.S. at 536 fn. 12.

Indeed, "*harm to the market for the copyrighted work is more important than the purpose for which the copies are made*." *Kadrey v. Meta Platforms, Inc.*, 788 F.Supp.3d 1026, 1035 (N.D. Cal. 2025) (emphasis added). Even when a use is found to be "transformative" (which is not the case here), it does *not* "automatically inoculate[]" the use from a "claim of copyright infringement." *Id.* Even transformative works have "*the ability to severely harm the market for the works* being copied, and thus severely undermine the incentive for human beings to create." *Id.* (emphasis added)

The fourth factor is tied to the other fair use factors. "The first and fourth factors are closely related, as the more copying is done to achieve a purpose that is the same or substantially similar to the original, the more likely it is that the copy will serve as a '*satisfactory substitute for the original*.'" *Hachette Book Group, Inc. v. Internet Archive*, 115 F.4th 163, 189 (2d Cir. 2024) (emphasis added). Further, when "a case involves commercial use, such as here, 'the defendant must rebut that *presumption* of market effect.'" *Nat. Fire Protection Assoc., Inc. v. UpCodes, Inc.*, 753 F.Supp.3d 933, 965 (C.D. Cal. 2024) (emphasis added). Also, the "third and fourth factors are interrelated, as the greater the amount and substantiality of the use, 'the greater the likelihood that the secondary work might serve as an effectively *competing substitute for the original*.'" *Hachette*, 115 F.4th at 187-188 (emphasis added).

The fourth factor "encompasses both (1) the extent of market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original and the market for derivative works." *McGucken*, 42 F.4th at 1163. Even when there is "little direct evidence of actual market harm" caused by the secondary use, "to negate fair use," the plaintiff "need only show that if the challenged use should become widespread, it would adversely affect the ***potential*** market for the copyrighted work." *Id.* (original emphasis).

At bottom, the fourth factor "asks ***whether consumers treat a challenged use 'as a market replacement'*** for the copyrighted work[.]" *Nat. Fire*, 753 F.Supp.3d at 965 (emphasis added). The fourth "factor points against fair use when ***a copyist makes copies available that displace demand for copies the copyright owner already makes available or readily could***." *Bartz*, 787 F.Supp.3d at 1031 (emphasis added).

The existence of market harm is overwhelming. As discussed in Sections IV.B-D, (1) Denims made numerous statements expressing her purpose to siphon views from *The Nuke* to herself; (2) the extent of her commentary was insufficient to justify using the entire *The Nuke* immediately upon release; (3) by hosting a watch party of *The Nuke* immediately upon release, there was no opportunity to watch the original before her watch party; (4) Denims' prior statements acknowledging her watch parties serve as market substitutes; and (5) her use was highly commercial, which results in a presumption of market harm.

The H3Snark Mods statements further demonstrate that Denims' watch party served as a market substitute for *The Nuke*. The H3Snark Mods: (1) knew H3Snarkers had an insatiable appetite for TEI's content; (2) knew H3Snarkers wanted to view pirated versions of TEI content to deprive TEI of views and revenue; and (3) provided H3Snarkers pirated versions of TEI content. Cmpt., pp. 17:14-

28:14.

Shortly prior to the release of *The Nuke*, the H3Snark Mods publicly acknowledged that H3Snarkers wanted to watch pirated versions of *The Nuke*. Their highly visible pinned community post stated: "***We have seen a lot of comments about wanting to watch the nuke without showing support for H3***" and provided a list of substitutes, including Denims. Cmpt., p. 40:5-27; Ex. G (emphasis added). Therefore, the H3Snark Mods knew H3Snarkers wanted to watch pirated versions of *The Nuke* and identified Denims as providing a substitute.

On January 31, 2025 (*i.e.*, the day *The Nuke* was released), the H3Snark Mods made two more highly visible pinned community posts. One provided a picture of Denims with a link to her stream entitled: "***DENIMS is LIVE reacting now to today's H3 podcast episode and the 'content nuke' video Ethan is publishing in about an hour***." Cmpt., p. 41:9-16; Ex. I (original and added emphasis).  The other linked various creators, including Denims, as a place to watch *The Nuke* instead of the original. Cmpt., pp. 40:28-41:8; Ex. H.

These posts by the H3Snark Mods show they offered Denims' watch party as a substitute for watching *The Nuke* itself. It drove an unprecedented number of viewers to her stream – along with the other individuals on the list who hosted similar watch parties. Cmpt. 50:17-51:12; RJN, ¶¶ 4-7, Exs. 5-8.

The 4/29/26 Order emphasizes this point. If found that TEI did – "not merely allege these facts" but proffered "specific evidence that the [H3Snark Mods] specifically instructed other potential viewers to watch Denims' 'watch party'" to deprive TEI of views. 4/29/26 Order, pp. 9:11-10:10. Further, TEI proffered "credible evidence" the H3Snark Mods "understood" Denims' purpose was to deprive TEI of views and "facilitated this goal by encouraging other people to watch Denims' watch party." *Id.*

Denims' chat dispels any doubt that they viewed her watch party of *The Nuke* as a substitute for the original. Below are screenshots of a *few* examples with

21

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

timestamps:

Simplemoto: Denims, I'd like to thank you from the bottom of my heart, for being willing sabotage your own algo so we can rob him of 4000 views by you streaming it to us instead

Ex. K at 00:13:14.

drfeltcher: Chat make sure you only watch the content nuke on a stream. Don't give E engagement for this. It's what he wants

Ex. K at 00:27:25

proletariatbomb: I appreciate you watching it so i dont have to give ethan a view to wat implode

Ex. K at 00:28:12

supportingorfeeding: It would be funny af if his nuke lost initial viewers because people their reactions to it today

Ex. K at 28:20

uniceky: Chat watch it with denims don't try to watch it on your own, don't give him

Ex. K at 1:03:57

NorthBoundTrain: dont watch it on h3's channel

Ex. K at 1:14:23

verdanteclipse: Never heard of denims before but I wanted to watch the Ethan crash out wi giving him any views. Denims definitely has star power, no wonder she has more live viewer rn.

Ex. K at 3:05:29

drfeltcher: Chat....remember don't go watch this on Ethan's channel or comment. He hate viewers as well and we shouldn't give them to him

Ex. K at 3:12:26

CtrlSaltEsc: thank you for providing a way to cringe at the video without feeding it a view

Ex. K at 5:08:07

jkmoran99: Thank you for helping us avoid the sin of giving Ethan views

Ex. K at 5:08:57.

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

When Denims' audience swelled to an unprecedented number of over 40,000 concurrent viewers, her chat commented that the number was uncharacteristic.

Att4ck_Th3_Bl0ck: Did I miss something... are you normally at 39K viewers on your streams?

Ex. K. at 3:47:57.

ChildishNA: 40k on Denims, 9 hour stream whats going on here

Ex. K at 4:11:55

eliashunterwood: whats with the 40k viewers?

Ex. K at 4:18:43.

Most damning, Denims' chat noted a precipitous drop-off of viewers immediately after *The Nuke* stopped playing (Ex. K at 5:06:22) – *i.e.*, the vast majority of viewers were there to watch *The Nuke* and not her.

iAMcashier: instant drop to 8k viwers

Ex. K at 5:07:03

2terrySD: maybe it wasnt viewbots, the view count fell back to 7k straight after

Ex. K at 5:10:03.

Denims' arguments against market harm are essentially "never mind the man behind the green curtain." She asks this Court to ignore: (1) the statements she made evidencing her purpose to siphon views away from *The Nuke* to herself; (2) that streaming *The Nuke* immediately after its release successfully achieved this purpose; (3) that H3Snarkers wanted to view a pirated version of *The* Nuke, which she provided; (4) the statements from her chat demonstrating that they viewed Denims' watch party as a substitute for the original; and (5) other individuals engaged in the same conduct as Denims. Motion, pp. 26:4-12, 28:6-12. Denims cannot handwave these facts as "conclusory allegations" or simply "implausible." She must confront the fact that she successfully achieved her purpose: to siphon views away from *The Nuke* to herself.

23

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

Denims' remaining arguments are equally frivolous. The fact that her watch party was on an "interactive, chat-centric" platform does not create a fundamentally different viewing experience. Motion, p. 27:2-6. Nor did Denims provide sufficient commentary – like in *Stebbins* and *Hosseinzadeh* – to consistently create a fundamentally different viewing experience. *Compare Id.*, p. 20:13-23 *with* Section IV.B; RJN, ¶¶ 1-2, Exs. 2, 4. Nor is this case analogous to *Hughes v. Benjamin*, 437 F.Supp.3d 382 (S.D.N.Y. 2020). Motion, pp. 27:15-28:5. Unlike that case, it is plainly obvious Denims' viewers were keenly aware of *The Nuke* and wanted to see it – albeit a pirated version. Section IV.B; 4/29/26 Order, pp. 9:11-10:10.

Therefore, the fourth factor weighs against fair use.

## V. CONCLUSION

For the reasons set forth above, TEI respectfully requests this Court to deny the Motion.

Dated: May 1, 2026                    **HEAH BAR-NISSIM LLP**

By   /s/ Rom Bar-Nissim
ROM BAR-NISSIM
Attorneys for Plaintiff Ted
Entertainment, Inc.

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record for plaintiff Ted Entertainment, Inc. certifies that this brief contains 6,997 words, which complies with the word limit of L.R. 11-6.1, 11-6.2 and Section G.4 of the Court's Standing Order.

Dated: May 1, 2026                    **HEAH BAR-NISSIM LLP**

By  /s/ Rom Bar-Nissim
    ROM BAR-NISSIM
    Attorneys for Plaintiff Ted
    Entertainment, Inc.

OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS