BENJAMIN KASSIS (SBN 298844)
ben@frostllp.com
BENJAMIN GRUSH (SBN 335550)
bgrush@frostllp.com
DAVID TIRATURYAN (SBN 350995)
david1@frostllp.com
FROST LLP
10960 Wilshire Boulevard, Suite 2100
Los Angeles, California 90024
Telephone: (424) 254-0441
Facsimile: (424) 600-8504

Attorneys for Defendant
ALEXANDRA MARWA SABER p/k/a DENIMS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| TED ENTERTAINMENT, INC., a California Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ALEXANDRA MARWA SABER f/k/a MARWA TALATT ABDELMONEM p/k/a DENIMS, an individual, and DOES 1-10,<br><br>Defendants. | Case No. 2:25-cv-05564-WLH-PD<br><br>*Hon. Wesley L. Hsu*<br><br>**DEFENDANT ALEXANDRA MARWA SABER'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Hearing Information:<br>Date: June 5, 2026<br>Time: 1:30 p.m.<br>Crtrm.: 9B (9th Floor)<br><br>Action filed:    June 19. 2025 |

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................... 1

II.   DENIMS' LIVESTREAM REACTION IS A FAIR USE OF THE NUKE ................................................................................................. 2

    A.    Denims' Livestream Reaction Is Highly Transformative ...................... 2

    B.    The Nuke Is Not Within The Core Of Copyright Protection ................. 7

    C.    Denims' Use Was Reasonably Tailored To Its Purpose ........................ 8

    D.    Denims' Use Did Not Cause Any Cognizable Market Harm ................. 9

III.  CONCLUSION ..................................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Soc'y for Testing & Materials v. UpCodes, Inc.*,
172 F.4th 253 (3d Cir. 2026) ...................................................................................5

*Brunson v. Cook*,
2023 WL 2668498 (M.D. Tenn. Mar. 28, 2023)...............................................2, 8

*Elvis Presley Enters., Inc. v. Passport Video*,
349 F.3d 622 (9th Cir. 2003) ..................................................................................8

*Hustler Mag. Inc. v. Moral Majority, Inc.*,
796 F.2d 1148 (9th Cir. 1986) ............................................................................6, 7

*Korman v. Free Beacon LLC*,
2026 WL 867860 (E.D. Va. Mar. 30, 2026) ..........................................................7

*McZeal v. Blue Castle (Cayman) Ltd.*,
2025 WL 3899249 (C.D. Cal. Oct. 28, 2025) .........................................................3

*Seltzer v. Green Day, Inc.*,
725 F.3d 1170 (9th Cir. 2013) .................................................................................9

**Court Rules**

L.R. 11-6.1 ....................................................................................................................11

Rule 56............................................................................................................................11

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    <u>INTRODUCTION</u>

Denims' use of The Nuke in her livestream reaction is fair as a matter of law. In opposition, TEI engages in a hyper-technical exercise chock-full of misdirection and aimed at demeaning the nature of Denims' criticism of The Nuke documentary—falsely speculating that had Denims truly intended to criticize The Nuke, she would have done it differently. But the question before this Court is not how one's use might have been hypothetically "fairer." The central question is whether the use ***that occurred*** was sufficiently transformative.

TEI resorts to splitting the hairs of Denims' reaction and chiding her alleged "tangents" because TEI must recognize it has no legally supportable retort to Denims' showing that her livestream reaction made a vastly transformative use of The Nuke. In live-reacting to The Nuke—an informational "tragi-comic documentary" sourced in the Israel-Palestine conflict comprised almost entirely of publicly available online content—Denims:

- Spent almost 4 hours, or 2.5x the length of the original, discussing the film and administering her reaction;

- Criticized the film's production quality and rebutted and debated the broad swaths of political commentary provided by Klein;

- Stopped, started, rewound, or took down The Nuke at over 200 separate points to engage in live commentary;

- Featured a live chat panel so that viewers could respond to comments and engage in the discourse led by Denims.

As can be seen from review of the livestream reaction, one would not have watched Denims' livestream critique of The Nuke unless intending on doing so ***in order to watch Denims***.

The Court need only look to TEI's own allegations—including that Denims' viewership included Klein's "fallen fans" who, rather than comprising a potential market for the original The Nuke, go out of their way to avoid "giving" TEI views on the h3h3 YouTube channel—to find Klein's and Denims' markets are not coextensive

1

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

but, rather, are diametrically opposed. Adding to this that the transformative nature of Denims' reaction is such that the markets cannot otherwise conceivably overlap, the Court can determine as a matter of law that the risk of market harm to TEI is remote, if not nonexistent.

The Section 107 factors, taken separately and undoubtedly when considered together, weigh decidedly in favor of finding fair use on the undisputed facts of this case. The Court should grant the Motion.

## II. DENIMS' LIVESTREAM REACTION IS A FAIR USE OF THE NUKE

### A. Denims' Livestream Reaction Is Highly Transformative

TEI cannot rebut Denims' showing that her use of The Nuke is fundamentally transformative. (Mot. 7-14.) It consists of a livestreamed single-use format with a live chat panel, over 200 stops and starts, and relentless live commentary—on a range of topics but all stemming from Denims' reaction to The Nuke and mostly concerning The Nuke itself. (*Id.*) She discusses production quality, responds to Klein's scathing criticisms of Piker and Twitch, disputes Klein's broader political statements and conclusions, and discusses geopolitical issues tangential to the Israel-Palestine conflict. (*Id.*) She repeatedly paused, removed, and rewound The Nuke as she reacted and engaged with the contemporaneous live chat. (*Id.*) The reaction was broadcast in a livestream format on Twitch, whereas The Nuke is an edited video posted for redistribution on a YouTube channel. (*Id.*)

TEI does not meaningfully dispute Denims' showing that the nature and format of her reaction renders it transformative, nor can it. *Stebbins*, 2025 WL 2233208, at *4-5 (full-length unrehearsed reaction livestream was transformative, including on the basis that it was a livestream, not an edited production, and included a live chat panel); *Brunson v. Cook*, 2023 WL 2668498, at *11 (M.D. Tenn. Mar. 28, 2023) ("[W]hen a work is posted to platforms such as YouTube, Instagram, and Twitter, the 'creator loses the ability to control either duplication or further distribution of his or her work.' Indeed, the fundamental purpose of social-media platforms such as Twitter

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

and Instagram is for viewers to share and re-share content posted by creators such as Plaintiff.").

While TEI devotes significant ink to parsing and chiding the contents of Denims' critique as if she were a student in a debate class, claiming her reaction is not sufficiently thorough and sophisticated to be considered transformative, it is settled one's output need not be "necessary, accurate, or well-executed" to constitute the "criticism and commentary" sufficient to render the use transformative under the controlling legal principles. *Hosseinzadeh*, 276 F. Supp. 3d at 46. Applying a surgical, pedantic approach—like the one TEI implies should govern here—would come dangerously close to endorsing the "rigid, bright-line approach to fair use" Congress eschewed in enacting Section 107. *Campbell*, 510 U.S. at 584.

Moreover, the function and purpose of Denims' reaction was to "disagree" with The Nuke (Compl. ¶ 70.a.vi) and, as TEI admits, Denims "***use[ed] The Nuke for the exact opposite purpose***" of The Nuke's original purpose (*id.* ¶ 70.o) (emphasis added). *Religious Tech. Ctr.*, 907 F. Supp. at 1379 ("Because [defendant's] use of copyrighted materials served a completely different function than that of the plaintiffs, this factor weighs in [defendant's] favor."). TEI addresses neither its admission in the Complaint nor the undisputed fact itself observable from the stream—that Denims' use served an utterly distinct function—and TEI thus concedes it.

In opposition, TEI reverses courses and claims the "purposes of the works overlap" (Opp. 8), but they indisputably do not. *McZeal v. Blue Castle (Cayman) Ltd.*, 2025 WL 3899249, at *4 (C.D. Cal. Oct. 28, 2025) (plaintiff cannot amend pleading in opposition brief). The Court need only view Denims' livestream—consistent with Denims' real-time recognition that her viewers wanted to watch someone "who would disagree" with The Nuke (Compl. ¶ 70.a.vi)—to distinguish the wholly disparate purposes. On this particular score, TEI is correct that what "[Denims] says or thinks or feels" (*see* Opp. 10) is relevant to the fact of what Denims did.

While TEI contends a use cannot be transformative where a defendant "copies

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

more than is necessary to facilitate 'comment or criticism'" (Opp. 8), TEI ignores that in no livestream reaction media will the reactor pre-select exactly how a subject will be discussed prior to the use. That would undermine the media form. Moreover, it is not disputed that Denims reacted to The Nuke, not specific portions of it. Her stated purpose was always a reaction to the full film. The idea that a live reaction to a work must simultaneously cull only pre-selected bite-size aspects of the work produces a catch-22 for any creator engaged in livestreamed reaction content. TEI's repetitive speculative claim that if Denims actually sought to criticize The Nuke she would have watched it alone, prepared her commentary on specific portions, and then posted her critique (Opp. 11-12, 16) must be rejected. The analysis does not ask what a defendant might have done to accomplish an arguably "fairer" use; the analysis considers whether the use in question is fair.

TEI's related claim about the lengths of segments of The Nuke – that "70% of its total runtime" was played in "uninterrupted" "30 seconds or longer" chunks during the reaction (Opp. 11) – is confounding. First, it implies bright-line rules apply, when none do. Second, to effectively react to The Nuke Denims needed to show meaningful segments of it throughout. *E.g.*, *Campbell*, 510 U.S. at 588 ("[P]arody must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable."). Indeed, playing "30 seconds" of a work and then pausing to critique is precisely what TEI claims falls within fair use: "interspers[ing] short segments of another's work with criticism and commentary." *Hosseinzadeh*, 276 F. Supp. 3d at 40, n.1. Third, the "70%" metric is arbitrary on its face. TEI marshals no legal support or argument for why or how that statistic is relevant.

TEI's repeated reference to Denims' use as a "watch party" or "group viewing session," implying an uninterrupted rebroadcast, is grossly misleading. The semantics lacks legal significance, and TEI's focus on it is similarly telling. The Court's review of Denims' reaction will dispel any notion that Denims merely hosted a "watch party" for the public to watch a rebroadcast of The Nuke, as if watching a blockbuster in a

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

movie theater. Nor did *Hosseinzadeh* define what the court meant by "group viewing session"—or remotely suggest all uses where a group gathers to view a reaction are not fair—and to the extent Denims ever herself referred to her livestream reaction as a "watch party," that is not remotely dispositive.[1] *Am. Soc'y for Testing & Materials v. UpCodes, Inc.*, 172 F.4th 253, 262 (3d Cir. 2026) ("This is an 'objective inquiry into what use was made, i.e., what the user does with the original work' and is not dependent on subjective intent."). It must be for this reason TEI resorts to deception, blatantly misrepresenting to the Court the contents of Denims' statements relating to her reaction.[2]

Nor does any commercial aspect of Denims' use outweigh its transformation. TEI emphasizes Denims solicited subscribers and donations, but fails to address the undisputed fact (reasonably inferred from the pleadings) that Denims' solicitation of subscribers and donations are not unique to The Nuke; if anything, Denims was clearly leveraging **her reaction and her performance as a reactor** to The Nuke to potentially gain fanfare. While reactions "vary widely in terms of purpose, structure, and the extent to which they rely on … copyright material," *Hosseinzadeh*, 276 F. Supp. 3d at 40, n.1, Denims' reaction here delivered a starkly different purpose; was

---

[1] In the motion to quash proceeding, Magistrate Judge Kim did not make a finding Denims' hosted a "watch party" to "hatewatch" The Nuke. (Opp. RJN, Ex. 9.) The court merely found TEI alleged a prima facie case for infringement and expressly disclaimed any analysis of fair use, (*see id.* pp. 6-7) rendering TEI's assertion (at Opp. 2) that Judge Kim held TEI "proved" Denims hosted a "watch party" for "potential viewers" of The Nuke misleading.

[2] For instance, TEI claims Denims sought to "siphon views away from The Nuke to herself" by "telling a chatter "If you want to enjoy it, you know, come enjoy the watch party somewhere else." (Opp. 10.) Denims' full statement reveals TEI's attempt at deception. (Ex. K at 00:23:10 ("Don't go bother Hasan while he's in Japan having a good time. Don't bother him about this stupid garbage.…The last thing I would want while I'm vacationing in Japan is to be linked a hundred times some video from a deranged ex of mine, right? If you want to watch it, watch it with someone else who's already watching it. You know, come enjoy the watch party somewhere else.").)

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

structured in a starkly different format; and incorporated only the extent of copyright material to which she was reacting, here The Nuke as a complete unified subject of criticism—all of which neutralize any alleged commercialism. *Campbell*, 510 U.S. at 579; Mattel, 353 F.3d at 803 (work's "commercial qualities become less important" where use is highly transformative); *Stebbins*, 2025 WL 2233208, at *5 ("incidental" commerciality "outweighed by the highly transformative nature of the Livestreams"). *See also Campbell*, 510 U.S. at 584 ("[n]o man but a blockhead ever wrote, except for money").[3]

Finally, TEI fails to rebut Denims' explanation that, when considered through a "flexible" and "holistic" lens and given the subject matter, her use becomes all the more fair. (Mot. 7.) *Tresona*, 953 F.3d at 647 (fair use an "equitable rule of reason"). Denims' livestream reacted to a 102-minute "documentary" about the Israel-Palestine conflict and related political ideology which, for the majority its runtime, castigates both Denims' political ally Piker and the twos' streaming platform, Twitch. The Nuke targets Denims insofar as she, like Piker, is a well-known alleged "alt left" Twitch livestreamer with strong positions on the Israel-Palestine conflict who generally promotes "left-leaning" political ideologies. (Compl. ¶¶ 16-17.) It even features clips *of Denims* from Twitch in which she joins a panel discussion with other politically active livestreamers during the section that attacks Twitch as a platform that supports far left-leaning political voices. (Ex. K at 4:25:17.) In other words, Denims' reaction to The Nuke was in the nature of responding to criticisms about her, her politics, and the platform that sponsors her. *See Hustler Mag., Inc.*, 606 F. Supp. at 1536 ("Courts balance [the Section 107] factors to determine whether the public interest in the free flow of information outweighs the copyright holder's interest in exclusive control

---

[3] TEI fails to point out that the donations came from live chat participants whose chats Denims read aloud, which results in a donation. There is no allegation or evidence from which to infer that Denims was receiving donations for merely rebroadcasting The Nuke.

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

over the work.").

TEI does not meaningfully respond to this. TEI claims the "public interest" in the Israel-Palestine conflict does not assist Denims, citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985), but the Supreme Court did not purport to undermine Denims' point—not remotely. The Court merely observed a work being "'newsworthy' is not an independent justification for unauthorized copying of the author's expression prior to publication." *Id.* at 557. Denims' contention, which finds support in the subsequent caselaw, is that where a "political, social or moral debate" undergirds the subject matter of a work – especially where the work is informational in nature – fair use protections increase. *Hustler Mag. Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1151–52 (9th Cir. 1986) (observing Falwell was not palming work off as his, but rather was responding to Hustler's personal attack on him); *see also Korman v. Free Beacon LLC*, 2026 WL 867860, at *9 (E.D. Va. Mar. 30, 2026) ("Imposing a requirement on journalists to receive permission from, and pay royalties to, copyright holders to use their photographs … would frustrate the balance Congress struck between robust copyright protections and the free flow of ideas.").

**B.     The Nuke Is Not Within The Core Of Copyright Protection**

TEI fails to explain how the second factor does not weigh heavily in Denims' favor. Whether or not encompassing stylistic decisions and editing, The Nuke is fundamentally an informational work relating to real world events comprised almost entirely of material from other public online sources concerning various geopolitical issues. (Mot. 3-4.) To this end, as a factual and informational mosaic of ***other people's copyrighted material***, The Nuke is lightyears from the "core of intended copyright protection." *Campbell*, 510 U.S. at 586 (citing cases contrasting uses). TEI has no response to this other than to summarily contend The Nuke is "creative," citing the *McGucken* case, 42 F. 4th 1149 (9th Cir. 2012), which is inapposite as that case concerned "aesthetically and creatively shot" photography, not a documentary about geopolitics and current events.

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

TEI argues Denims conducted her reaction just after TEI released The Nuke. That is immaterial. The fact is that The Nuke was published, and from that moment anyone could have watched The Nuke on the h3h3 YouTube channel when it was released on January 31, 2025—and presumably hundreds of thousands of Klein's supporters or anyone interested in watching The Nuke did just that. *Brunson*, 2023 WL 2668498, at *12 (discussing that posting a video on YouTube means "the work could then be shared by a theoretically infinite number of individuals to a variety of different web-based platforms"). For these reasons, the second factor weighs heavily in Denims' favor.

### C.    <u>Denims' Use Was Reasonably Tailored To Its Purpose</u>

TEI's lackluster response to the third factor focuses on TEI's speculation that Denims would have reacted only to pre-selected slices of The Nuke if her intention to react and critique was sincere. (Opp. 17-19.) As Denims has explained, her livestream reaction was intended to react to The Nuke as a singular work and her reaction in kind was a singular use of The Nuke. (Mot. 15-16.) That Denims' commentary on (or otherwise derived from) the contents of The Nuke persisted until the end of the film supports Denims' position that her use was reasonably tailored to the purpose of the use. *Stebbins*, 2025 WL 2233208, at *6 ("Without featuring the original clips, the Livestreams would have lost utility as critical commentary. The extensive copying was necessary to the critique."). TEI's cases support Denims' logic. *Cf. Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 630 (9th Cir. 2003) (observing "the intended use" controls). To accomplish the intended format of a real time livestream reaction to The Nuke, Denims could not have only selected portions of The Nuke to post and comment on.[4] Because livestream reacting to all of The Nuke required

---

[4] TEI argues (Opp. 16) Denims' graphic on page 17 of the Motion is unauthenticated and misleading. Neither is correct. The graphic is derived from the undisputed hard data embedded in Exhibit K to the Complaint. It is intended to illustrate a linear, digestible view of Denims' commentary pauses to respond to TEI's claim that Denims

showing all of The Nuke, the third factor tips in Denims' favor or is at worst neutral.

### D.   Denims' Use Did Not Cause Any Cognizable Market Harm

TEI does not adequately rebut Denims' showing that the fourth factor weighs towards fair use.

First, TEI ignores Denims' legal arguments that the degree to which Denims' use was transformative, and resulted in a fundamentally different viewing experience, drastically undermines TEI's claim that the reaction is a "market substitute." *See, e.g.*, *Stebbins*, 2025 WL 2233208, at *7 ("Anyone seeking to watch the Livestreams would have a fundamentally different viewing experience than a person seeking to watch the Retrospective."); *Hosseinzadeh*, 276 F. Supp. 3d at 47 ("[A]nyone seeking to enjoy [the original] on its own will have a very different experience watching the [reaction] video…."). Where a use, like here, is so transformative that the consumer cannot plausibly have a similar experience, the conceivable effect on the market decreases.[5] TEI concedes this point.

Second, Denims could not have usurped The Nuke's market because her "target audience and the nature of the [allegedly] infringing content" are not remotely the same as the original. *See Hughes*, 437 F. Supp. 3d at 394. TEI alleges (1) The Nuke is designed to "critique" (i) Piker who "radicalizes his audience with genocidal and antisemitic terrorist propaganda," and (ii) Twitch which allegedly "platforms" Piker without restraining his speech (Compl. ¶ 40); (2) that Denims is an allegedly "loyal

essentially rebroadcasted a "pirated" copy of The Nuke. *Cf Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013) ("In the typical 'non-transformative' case, the use is one which makes no alteration to the expressive content or message of the original work.") (emphases omitted)).

[5] Like in *Stebbins*, here, Denims "[did] not merely play [The Nuke] straight through. Instead, [she] rewind[ed] and repl[ied], pause[d], and talk[ed] over [The Nuke] video as the panelists engage with each other and with [Denims]." *See* 2025 WL 2233208, at *7 (citing *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1181 (9th Cir. 2012) ("where 'the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred'")).

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

and ardent" and "cultish" defender of Piker who "leaches" from his audience (*id.* ¶ 17); and (3) the "H3Snarkers"—or "fallen fans" and now opponents of Klein—comprised at least part of the viewing constituency of Denims' reaction to The Nuke.[6] (*Id.* ¶ 23.)

Not only is there no question Denims' viewership and TEI's viewership are diametrically *different*, TEI alleges the viewing constituency of Denims proactively avoid watching TEI's original content. To wit, TEI alleges the "H3Snarkers," which consists of people TEI contends amount to some of Denims' audience, are motivated to *deprive TEI of views and revenue* (Opp. 20), belying TEI's claim that these same individuals in any meaningful mass would have watched The Nuke and thereby *given* TEI views and revenue, but for Denims' livestream reaction. (*See also* Compl. ¶¶ 29-30 ("The H3Snark users, however, did not want TEI to receive any views or advertising revenue from their consumption of TEI's content.").) TEI's claim that Denims' viewers wished not to support TEI by avoiding viewing The Nuke on the h3h3 YouTube channel resolves any doubt. Denims cannot usurp a market that, according to TEI's own allegations, does not even exist.

Thus, TEI admits Denims' audience does not and would not overlap with TEI's because, as the allegations confirm, Denims' audience would not have watched the original The Nuke on TEI's h3h3 YouTube channel given the contrasting ideologies and because, in addition, doing so would give TEI views, which Denims' audience allegedly go out of their way to avoid. The allegations and evidence leave no genuine doubt that Denims' viewership – at least to the extent alleged by TEI – contained people who openly did not ever intend to watch the original The Nuke on the h3h3 YouTube channel.[7]

---

[6] TEI does not allege any other audience profiles.

[7] Denims does not object to the Court's consideration of two of the other livestream reactions to The Nuke. Like Denims, "Kaceytron" and "Frogan" are young, female "left-leaning" livestreamers who have publicly opposed Klein. While Denims does

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

Grasping at straws, TEI points to either cherrypicked out-of-context statements by Denims which have nothing whatsoever to do with The Nuke or her reaction (*e.g.*, Opp. 10, 20) and which should thus be disregarded or a handful of comments in the reaction's live chat panel from individuals suggesting Denims' reaction enabled them to avoid watching the original The Nuke. But the import of this handful of sporadic comments by viewers is both belied by TEI's other allegations (discussed above) and is otherwise immaterial. Indeed, TEI alleges h3h3 Productions, where The Nuke was posted for distribution, has **5.49 million** subscribers. (Opp. RJN Ex. 1.)

Meanwhile, Denims' livestream reaction at its peak was seen by allegedly just 45,800 viewers and of that number – which is less than 1% of TEI's subscriber base – TEI identifies fewer than ten individuals who, based on their vague comments, hypothetically may have watched The Nuke rather than Denims' reaction. Accordingly, any purported market harm risk resulting from Denims' reaction alleged by TEI is immaterial, neutralizing any adverse weight this factor might otherwise carry. *Campbell*, 510 U.S. at 590 n.21 ("This factor, no less than the other three, may be addressed only through a 'sensitive balancing of interests.'…Market harm is a matter of degree, and the importance of this factor will vary, not only with the amount of harm, but also with the relative strength of the showing on the other factors.").[8]

## III. CONCLUSION

For these reasons, Denims respectfully requests that the Court grant the Motion.

---

not oppose TEI's RJN because Denims does not believe any of the attached evidence is material, Denims will note, for the avoidance of doubt, that the Court's consideration of any such materials does not covert Denims' motion into a Rule 56 motion.

[8] TEI's opposition memorandum exceeds the 7,000 word limit imposed by L.R. 11-6.1 by approximately 635 words. TEI excluded the 20 footnotes contained in its brief from its certified calculation of the word count.

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS

DATED:  May 8, 2026          FROST LLP

By: _____

BENJAMIN KASSIS
BENJAMIN GRUSH
DAVID TIRATURYAN
Attorneys for Defendant
ALEXANDRA  MARWA  SABER  p/k/a DENIMS

12

## CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Alexandra Marwa Saber certifies that this brief contains 3,838 words, which complies with the word limit of Section G.4 of the Court's Standing Order.

DATED:  May 8, 2026                 FROST LLP

By:  _____
    BENJAMIN KASSIS
    Attorneys for Defendant
    ALEXANDRA   MARWA   SABER   p/k/a
    DENIMS

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS