UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES

| | |
|---|---|
| TED ENTERTAINMENT, INC., Plaintiff, v. ALEXANDRA MARWA SABER, et al., Defendants. | Case No. CV 25-5564-WLH (PDx)<br>Los Angeles, California<br>Friday, June 5, 2026<br>2:05 P.M. to 2:35 P.M. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WESLEY L. HSU
UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| Appearances: | See Page 2 |
| Deputy Clerk: | Claudia Gracia-Marquez |
| Court Reporter: | Recorded; CourtSmart |
| Transcription Service: | JAMS Certified Transcription<br>16000 Ventura Boulevard #1010<br>Encino, California 91436<br>(661) 609-4528 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For the Plaintiff: Heah Bar-Nissim LLP
By: ROM BAR-NISSIM
1801 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 432-2836
rom@heahbarnissim.com

For the Defendants: Frost, LLP
By: BENJAMIN G. KASSIS
10960 Wilshire Boulevard, Suite 2100
Los Angeles, California 90024
(424) 254-0441
ben@frostllp.com

LOS ANGELES, CALIFORNIA, FRIDAY, JUNE 5, 2026, 2:05 P.M.

THE CLERK: Calling item No. 8, Case 2:25-cv-5564, *Ted Entertainment, Inc. v. Alexandra Marwa Saber, et al.*

Counsel, please state your appearances for the record.

ROM BAR-NISSIM: Good afternoon. Rom Bar-Nissim on behalf of plaintiff.

THE COURT: Good afternoon.

BENJAMIN G. KASSIS: Good afternoon, Your Honor. Benjamin Kassis for Alexandra Saber, professionally known as "Denims."

THE COURT: Good afternoon.

The matter is on calendar on the defendants' motion for judgment on the pleadings as to the Complaint. We issued a tentative yesterday -- at some point yesterday. Hopefully, both sides have had a chance to review it.

Given the contents of the tentative, Mr. Kassis, is there anything that you want to be heard on?

MR. KASSIS: No, Your Honor.

THE COURT: Okay.

Mr. Bar-Nissim?

MR. BAR-NISSIM: Thank you, Your Honor.

Before I begin, it's always an unenviable task to try to persuade a judge to change their tentative, and so in advance I apologize if anything I might say might come across

as sharp-tongued or inelegant. So my apologies about that.

There are a number of things that I think it is worth drawing the Court's attention to with their tentative. First off, I think given the applicable standard of a motion for judgment on the pleadings, it is hard to reconcile the tentative with Judge Kim's decision about five weeks ago, and here's the reason why: Judge Kim recognized that there was an audience for the work, those that wanted to, albeit, hate-watch it, though that they were interested in consuming it, they just did not want to financially support it. Furthermore, the H3Snark moderators were aware of this audience that their users wanted to consume it, but they didn't want to support the original, and they provided defendant as an alternative to viewing the original.

So there is demonstrable market harm under factor four because there was an audience and they admitted that they would have seen the original if not for defendant's watch party. We have that evidence in statements in her chat. We have that in statements that the defendant herself read from her chat as well. And at the vey end of the watch party, at the fifth hour seventh minute, you will see that she has "H3Snark" up on her screen. So there clearly was some awareness that there was an audience that wanted to consume the alternative.

I think there's also a challenge that is to be

faced under *Warhol*. Under *Warhol*, we must always keep everything through the lens of justification and substitution, and this is where I think, really, things go into justification in the narrow sense, as was discussed in *Warhol*, and there are a number of facts that are omitted completely from the discussion in the Court's tentative. Most notable is the timing, and given the great public interest in this case, many have already read your tentative and taken it as saying that they can make a fair -- it is -- the commercial exploitation of an entire copyrighted work immediately upon release can be a fair use so long as you throw in some comments every couple of -- a minute or so and that can extend to things like a Disney show that is just released. The timing --

THE COURT: Well, I think that there is a distinction here. There is a major distinction between a -- for lack of more-precise terminology, a YouTube influencer making a business off of making a reaction video to a Disney movie, another -- a purely commercial product, and a politically charged response to a political documentary. I mean, doesn't that seem to be -- that strikes me as being more sort of what fair use was intended to cover than the Disney movie reaction video.

MR. BAR-NISSIM: Just so that I can understand the distinction you're making, it's more of the distinction

between what is being reacted to -- correct? -- rather than the --

THE COURT: Well, and the contents of the reaction.

MR. BAR-NISSIM: Oh, well, certainly the contents of the reaction is always important.

THE COURT: Yes.

MR. BAR-NISSIM: And I would stand firm on that having been the one that litigated two of the cases you cited in your opinion, which was *Hosseinzadeh* and *DraftExpress*. That, to me, is of utmost importance. But this is where it goes into the issue of *Warhol* with extent and structure because, for example, one of the things that -- I'll be candid. I was actually really interested in knowing defendant's opinion about was, if you recall, in each section -- whether it's Hamas, Hezbollah, or Ansar Allah -- there is a description of the activities that those particular organizations engage in and whether they're consonant with leftist values -- no comment on that at all.

This is where -- and the case is much more an issue like the *Elvis Presley* case, as opposed to your focus on De *Fontbrune* and *Monge*. In the *Elvis* case, it said sometimes it could -- was transformative, but other times it was not because it's being used in excess of its benign purpose. And so, when there are huge swaths of the work that is not being commented upon, and certainly sometimes are the heart of the

work, it begs the question of why, then, had it be used in its entirety immediately upon release? Certainly there's a freedom to comment on it in the very strain that is at issue. There are three works by my client in there. We only moved on two, not the third. Why? Because the third one, even though there was very little commentary, was from a few days prior, and so then the risk of substitution was far less present because truly it is within the first few hours that a YouTube video has its greatest consumption demand, going into, maybe, a day or two.

And so that is why I think the timing, the structure, the critical bearing on what is being said -- in your own opinion, you note that there is a lack of critical bearing on the style or substance of the original when you note that -- for example, in the China example. Yes, initially it's starting to comment on it, but then it goes on a completely different side tangent unrelated to The Nuke whatsoever about disabilities and trans people and focus on the United States. Those comments would stand by themselves without any reference to The Nuke.

That is what I think is important, and that is why *Warhol* itself says, when you look at multiple uses of a work in a secondary work, you have to examine the justification for each constituent part that is being used in the whole. And this is where *Elvis* dovetails with that, where, when you

start using something in excess of it, coupled [sic] the fact that it was the timing, coupled with the fact that you had some comments that were -- I will hand it to -- and that's why, as you noted in the Complaint, there's sometimes where it is a very different purpose, but there are other times it's not, and I think one that's most notable is in the heart of the work, which is the sections on Ansar Allah, Hamas, Hezbollah, and so there are many things in there.

And in particular, we have stated in the Complaint -- it begins on page 56 through 57 -- details all -- very meaningful substantial points that were raised in the original work that were not addressed at all, and so therefore the fact that it's -- this is a case about extent, this is a case about timing, this is a case about the structure of the critique, this is a case about critical bearing, and the fact that there was an audience that wanted to see it and this was their alternative. And Judge Kim recognized that in her order when she cited the exhibits of the Complaint as stating that this was evidence -- not just allegations but evidence of market substitution through hate-watching.

And to be fair, Judge Kim did expressly punt on the fair use issue, but I think the language in her order makes some things very clear. So -- and this is where I think it goes to a point of confusion with the Court. Although it may

seem counterintuitive that opponents of the Kleins would want to watch the Kleins' programs, they were engaging in a cultural phenomenon known as "hate-watching," and she provides the definition of "hate-watching," and in the end she says: Here, the entire purpose of Denims's watch party was to hate-watch TEI's work without giving any benefit to TEI. There is credible evidence that the Doe defendants understood this goal by encouraging other people to watch Denims's watch party. Given that we are on a motion for judgment on the pleadings, where all facts are interpreted in our favor, I think the only way to get to this result is to ignore material facts in the record.

THE COURT: Did Judge Kim -- where did the hate-watching idea come from? Is it in the Complaint, or is it in the briefing?

MR. BAR-NISSIM: It was shown through the exhibits in the Complaint. It was also alleged in the Complaint in the section regarding the H3Snark. We talk about in detail in H3Snark sections about how they had a voracious demand for my client's works but they always wanted to provide options to pirate it, and here was one of the most notable examples:

There is a website called "YewTube" -- Y-e-w-tube. It does a backend to YouTube itself, where people can watch YouTube videos on the original YouTube, but it doesn't show any ads, and it doesn't add to the view count at all, which

impacts ad revenue and how well the -- it's seen in the algorithm. And so that's why we had all these allegations and exhibits where -- the exhibit attached to the Complaint expressly states, "We know many of you want to see The Nuke without supporting H3." What we talking about was supporting. And you have in the screenshots that we put in our opposition of people saying, "Thank you for doing this. Otherwise, I would have had to watch his original."

And when it was done -- a showing The Nuke was done, that's when there was a precipitous drop from 40,000 to 8,000, and it was commented in the chat. Were they there for the commentary, or were they there to see The Nuke without contributing to my client's ad revenue in the algorithm of what we can at least assert might have been 32,000, if not more, if it went down from 40- to 7- to 8,000?

THE COURT: Okay. Thank you. I think I want to ask Mr. Kassis.

MR. KASSIS: Sure.

THE COURT: Why doesn't that preclude judgment on the pleadings?

MR. KASSIS: For a couple of reasons. The -- first of all, the notion of hate-watching and individuals who wanted to watch a reaction are different. There's no allegation that distinguishes the two. So what happened here is a reaction video, right, twice as long -- over twice as

long as the original.

THE COURT: Sure.

MR. KASSIS: You know that, Your Honor.

THE COURT: Sure.

MR. KASSIS: And when you look at what actually happened, as Your Honor noted in the tentative, the transformativeness is vast because of how much Denims spoke, what she spoke about, her engagement with the audience. So if --

THE COURT: But what about --

MR. KASSIS: I was just going to get to that, I think, but you go ahead.

THE COURT: Okay. So what about the idea that Mr. Bar-Nissim interjected, which is that may be true for some of the video but because your client didn't -- I mean, I confess I watch reaction videos for things like Disney movies, but in the ones that I see, they show scenes. They show clips. They don't show the entire thing. They show clips where, you know, there's a particular emotional reaction or the reactor has something to say; right?

Here your client didn't do that. She displayed the whole thing -- pausing as she went but did display the entire thing. What about this notion that I need to go through and consider whether or not the entire thing was appropriate or whether or not there was fair use as to pieces of it but not

as to other pieces of it, for example? So I'm just hypothetically making something up because --

MR. KASSIS: Sure.

THE COURT: -- were at judgment on the pleadings.

MR. KASSIS: Yeah. So --

THE COURT: She has all this reaction, all of this, you know, commentary, and then plays 15 minutes of the video without pausing or interjecting or doing anything.

MR. KASSIS: So a couple of things. First of all, with respect to what is being considered and used from the primary work by the secondary user, the intention of what is commented on is important. The purpose here was to react to the documentary. You can't react to the documentary without showing the documentary. There's plenty of case law that discusses this. If she -- if Denims had said, "I want to talk about the first five minutes of this documentary because he talks about me," and then she does that, and then she plays the rest of it, it would be a different story, but it's -- this is a case by -- the analysis is obviously case-by-case.

The other, I think, important fact to keep in mind here is that Denims and Hasan are essentially political allies, this documentary targets Hasan all the way through, Denims is referenced peppered throughout, and Twitch is criticized throughout -- which is Denims's platform.

Moreover, this was a live-stream reaction. You cannot -- the entire premise of Twitch, which is a massive platform, is live stream, and a lot of it is live-stream reaction. So you -- they're mutually exclusive concepts. You can't live-stream react to a work while all the while knowing exactly what you're going to say, have it prepped, take out pieces that you want to talk about.

And moreover, *Stebbins* is a good example of why this is actually -- why fair use is not precluded here. In *Stebbins*, the defendants in that case could have taken little pieces of what the plaintiff in that case did and talked about the different sections and made similar points, but they didn't. They watched the whole thing and many -- and they paused, just like Denims did, to talk about what they were seeing and what they were watching. They engaged with the audience. It's very analogous.

And there's no proposition that says one cannot use an entire work in a fair manner. That does not exist. So you might have a five-minute piece of work in *Hosseinzadeh* -- in that case. You might have a 15-hour work in the *Stebbins* case. Here you've got a hundred-minute work that's commented on for almost 4 hours. There's no bright-line rules here; right? And so, if one is going to react to a work, they ought to be entitled to react to the work holistically. Obviously, this is a holistic, highly contextual analysis.

There's no concern that whatever happens in this case is going to affect some other -- it's not going to -- this slippery slope thing about Disney movies is -- respectfully, is just misplaced because you look at the use that occurred. It's an objective analysis; right? So, you know, whatever Denims may have said -- not relevant. What's relevant is what she did and was it transformative?

And here it was vastly transformative, as Your Honor noted in the tentative, so much so that it outweighs the incidental commercialism -- and that's why *Warhol* is not -- *Warhol* is not a problem for this analysis. It's actually -- it supports it. You know, in *Warhol*, the purpose of the secondary use was the same as the first use. Here they were the exact opposite. So the character of what she did was so different, the purpose was an opposite purpose, and so any commercial -- commercialism that also was extent -- incidental.

And so the notion of the H3Snark and these third parties and whatever they were saying -- if they wanted to just pirate this, why didn't they? Why didn't they just live stream it for their friends who don't like Ethan Klein? They didn't do that. They pointed to reactors in this political environment, in that political community talking about these current events and political issues. They pointed to "This person is going to do reaction to

Content Nuke. So is that person, and so is that person." And you know what? That's okay because of fair use. If they wanted to just watch it without giving Ethan views, they would have just pirated it actually and shown it all the way through on a live stream, which is not what happened here.

THE COURT: Okay. All right. Thank you.

MR. KASSIS: Thank you, Your Honor.

THE COURT: Mr. Bar-Nissim? Any last thoughts?

MR. BAR-NISSIM: Certainly. And thank you for giving me an opportunity to respond.

I think what was just illustrated here is what *Warhol* discusses as being justified in the broad sense but not in the narrow sense. It only works if we discuss it in the abstract, not when we get into the nitty-gritty details, and that therein is the problem.

And I think in terms of the argument that the work targets Hasan and Denims -- certainly that invites criticism, but that doesn't give an automatic license to utilize the work in a way that might not qualify as fair use. And in sense, it's saying we need to preserve the ability to live stream entire copyrighted works immediately upon their release even though the level of commentary might be uneven, inconsistent, and there might be substantial significant portions that are not commented upon.

And this is also, I think, the reliance on

*Stebbins*. When *Stebbins* was first introduced to me as being justification for judgment on the pleadings, immediately I realized how different it was. Two years apart were the two videos at issue -- two years. By two years a video is dead, not when it's immediately upon release. And there was an hour and a half of the original and 14 hours of commentary.

THE COURT: Well, this video -- Denims's video is significantly longer than your client's video.

MR. BAR-NISSIM: Well, not actually. No, no, no, no, no. Because, if you take the amount of the original that was played, it was a total -- and according to their bar graph that they put in -- an hour and 43 minutes. Okay? What remained was about 2 hours and 17 minutes. So that's why the ratio -- and this is why we put such emphasis on that. The ratio of original to commentary -- everything else really of this is what was -- the original was shown, 2 hours and 15 minutes constituted everything else, in comparison to *Stebbins*, which was an hour and a half of the original and 14 hours of everything else. That is truly a different viewing experience.

That was the same with *Hosseinzadeh*. *Hosseinzadeh* -- it viewed 60 percent of the original -- granted, it's a little bit different, but it was over three to one of commentary to the original. The amount used was about 3 minutes and 15 seconds. The entire reaction video was

14 minutes, meaning that there was about 10 minutes and 45 seconds of commentary.

THE COURT: Yeah, but I don't see any cases that require that the ratio be some particular ratio.

MR. BAR-NISSIM: I don't think it should -- I agree with you. It shouldn't be a particular ratio, but it is a barometer if we're talking about determining something as a matter of law on the pleadings that, when the ratio and the amount, the quantity, and the quality of the commentary is significantly more in those cases compared to this, because that's where the problem is, the unevenness of How much has a critical bearing? How much of it is being directly comment upon or being used to comment upon something else, such as how terrible the United States is when we're talking about the Uyghur genocide?

THE COURT: Which -- what is the best case for the proposition that I have to sort of dissect the reaction video and determine which parts were -- which individual parts of showing the original work were fair use and which parts were not?

MR. BAR-NISSIM: If I might just grab some notes.

THE COURT: Sure

MR. BAR-NISSIM: Apologize.

THE COURT: In other words, what is the case that forces me to dissect that instead of --

MR. BAR-NISSIM: Certainly.

THE COURT: -- just analyzing it as a whole?

MR. BAR-NISSIM: Oh. No. That is -- here's what -- in *Warhol* at 528, footnote 4, it says (reading): The court must consider each use -- each quoted passage within the whole. Okay? *Penguin Random House* says, if you use more than is necessary to facilitate the commentary and critique, it is not transformative. *Penguin House* also says every portion used, quote, must be in service to the commentary. Okay? It's not enough that some of it is transformative. And that's why it's the importance of *Warhol* and *Penguin House* to this proposition. *Elvis* says, when it is used in excess of a benign purpose, it is no longer transformative, and that's --

THE COURT: But I guess -- we're not living in the world of art or published books now. What about Mr. Kassis's argument about it's a live-stream reaction to a video; of course she has to watch the whole video in order for it to -- she has to use the whole work to create her transformative work?

MR. BAR-NISSIM: I --

THE COURT: Is there -- do you have a case that says that that is an invalid proposition?

MR. BAR-NISSIM: In -- I think it is an unprecedented proposition.

THE COURT: I see.

MR. BAR-NISSIM: Because -- and that is what makes judgment on the pleadings dangerous. Now, I understand, respectfully, my opposing counsel kind of pooh-poohed my parade of horribles. This is what already people are saying online. This is already how they're interpreting this to be. And that's why I think being much more exact about the critical things that were omitted is of utmost importance.

Even if you end up standing on your tentative, this community could use more guidance, and that's why I think it is important. I think merely the fact that it was live-streamed -- if -- what was preventing watching it beforehand and then commenting on the excerpts that want to be chosen upon? What prevented waiting to -- a day or two and then do it? Why did it have to happen at the exact moment it was released to the public? No one would have an opportunity to watch it. They either had to watch hers or they would watch -- would have watched the original -- many of them -- as we see.

THE COURT: Okay. All right. Thank you. I understand the argument.

Mr. Kassis, it's your motion; so do you want to -- do you have any last thoughts?

MR. KASSIS: Thank you, Your Honor. Just two final comments.

Just to respond briefly to the last statement made by my colleague, the question -- and we cited this proposition in our opening motion. The question is not what could have been fairer? It's was the use that occurred fair? Okay? And whatever people are saying online today, respectfully, I just -- I don't find that to be of any relevancy to this motion.

And then, lastly, I just want to -- I want to make sure that we're talking about transformativeness in the correct way because the law -- the case law does not say you must dissect each action within a use and determine whether that action or that act is transformative. You look at the collective holistic use and determine whether it is transformative. And of course here, all of those elements are present with the link, all of the speaking. If one wanted to watch this documentary and you tune in to what Denims did, 20 minutes later you'd be out of there; 5 minutes later you'd be out there. It's like you're watching a film and someone stops it for 15 minutes -- like, your internet goes down, that's going to ruin your night.

So the "case-by-case-ness" of this analysis, I think, is very paramount, and nothing about what this decision does is going to create any kind of slippery slope for this reaction culture that already exists to do anything different than what it's already doing.

Thank you, Your Honor.

THE COURT: Let me ask: What do you do with the quote from the *Penguin* case -- the *Penguin* books case, where you're only supposed to use what you have to use for the criticism?

MR. KASSIS: Well, respectfully, the use here was reasonably tailored to what was being reacted to and what was being commented on and what was being parodied, if you will. It was the whole work start to finish. And the law is that that is what governs is what the defendant intended to do, what was the use that was intended? And there's no question -- we've always been open about this is that Denims from day one when she announced that she was going to do it -- "I'm going to react to this documentary." There's no proposition that suggests one cannot react to an entire singular work and do it in a way that satisfies the fair use elements, which is what occurred here.

THE COURT: Okay.

MR. KASSIS: Thank you, Your Honor.

THE COURT: All right. Thank you very much. The matter is taken under submission. We'll issue an order as soon as we can.

THE CLERK: This court is in recess.

(Proceedings adjourned at 2:35 p.m.)

///

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa
Julie Messa, CET**D-403
Transcriber

August 17, 2026
Date